[Civ. No. 14840.   Second Dist., Div. Three.   Sept. 28, 1945.]

DONALD BURR FARMER et al., Appellants, v. HAROLD A. FAIRBANKS et al., Respondents.

Joseph D. Taylor and Charles A. Son for Appellants.

James V. Brewer and Kendall B. Perkins for Respondents.

DESMOND, P. J.—Plaintiffs appeal from a judgment entered after the trial court granted defendants' motion for a directed verdict in their favor upon completion of the testimony offered by both sides. The appeal is presented upon a settled statement in lieu of both a reporter's and clerk's transcript pursuant to rule 7(b), Rules on Appeal.

The action sought damages for the wrongful death of Dorothy Farmer Martin allegedly caused by injuries received in a collision of a truck and semi-trailer owned by defendant corporation, Safeway Stores, Inc., and an Oldsmobile coupe driven by the deceased. Plaintiffs Martin and Farmer are respectively the surviving husband of Mrs. Martin and her minor son by a former marriage.

The collision occurred on August 25, 1941, shortly after 9 o'clock p. m., at the intersection of Jefferson Boulevard and Centinela Avenue, a sparsely settled location in the

county of Los Angeles. Centinela runs generally in a north-erly-southerly direction, and terminates at the point where it intersects Jefferson. Jefferson is a through highway and runs in an easterly-westerly direction approaching the inter-section from the east in a slight curve. The main traveled portion of each highway consists of a pavement 30 feet wide bisected by a white center line. On Jefferson this 30 foot strip is bounded on the north by a paved shoulder 16 feet wide and a gutter 6 feet wide. On a line 22 feet north of the 30 foot strip is a curb. The strip on Jefferson is bounded on the south by a dirt shoulder. On Centinela the 30 foot strip is bounded on each side by a dirt shoulder 22 feet wide and a curb has been placed 22 feet west of the paved strip. On the west side of Centinela at a point approximately 60 feet north of the north curb line on Jefferson is a stop sign which regu-lates traffic moving in a southerly direction, and on the north-east corner of the intersection stands a two story stucco build-ing. Plaintiffs' Exhibit 12 shows the stop sign, the building and adjacent streets, while plaintiffs' Exhibit 7 is a picture of the intersection showing both highways, a corner of the building and the stop sign just visible in the background. These pictures indicate that a driver, after passing the stop sign and approaching the north line of the intersection, would have an extensive view east and west and, of course, a driver proceeding to the west on Jefferson would have the same oppor-tunity to observe conditions at the corner. Plaintiffs' Exhibit 6 clearly depicts the entire locality, showing all four corners of the intersection and also showing an arc light suspended above the center of the intersection. When the collision occurred, defendant Fairbanks, an employee of Safe-way Stores, Inc., was driving the truck and semi-trailer toward the west on Jefferson, while the deceased, according to the complaint, was driving her coupé in a southerly direc-tion on Centinela. Defendants' equipment, measuring 48½ feet in length, consisted of a truck or tractor, weighing 14,050 pounds, a jeep, weighing 3,150 pounds, and a semi-trailer, weighing 12,780 pounds. In addition, the semi-trailer con-tained grocery freight for five different stores of defendant corporation with a load weight of about 28,800 pounds. In other words, the total weight of defendants' entire equipment was about 30 tons. Certain traffic officers, who arrived shortly after the collision and who testified at the trial, placed the point of impact in the northwest quadrant of the inter-

section, approximately 8 feet north of the center line of Jefferson and between 8 and 9 feet west of the center line of Centinela. No other witnesses testified to the contrary. After the impact defendants' equipment veered to the southwest and came to rest partly on the southerly dirt shoulder of Jefferson, about 34 feet west of the prolongation of the west curb line of Centinela. Its semi-trailer had overturned on its right side and was resting on top of decedent's automobile, pancaking it and causing the injuries which were fatal to decedent. Plaintiffs' Exhibit 14, a photograph taken immediately after the accident, shows the trailer superimposed upon the coupé which is almost flat on the ground; it also shows the tractor in a leaning position directly in front of the semi-trailer. Plaintiffs' Exhibit 13 is a picture of the underside of the overturned trailer and shows, at the left, the wheels of the tractor with the left rear wheel up in the air.

The appeal is predicated upon two main points: That the trial court erred (1) in granting the motion for directed verdict because there was evidence from which a jury might have found that the defendants were negligent, and (2) in ruling on the admission and rejection of testimony of Albert Ashton, a traffic officer who investigated the accident and who was a witness for defendants.

█ The trial court has the power, in a proper case, to direct a jury to render a verdict in favor of the defendant when "there is no substantial evidence tending to prove all the controverted facts necessary to establish the plaintiff's case. It is not necessary that there should be an absence of conflict in the evidence. To deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one." (*Newson* v. *Hawley* (1928), 205 Cal. 188, 190 [270 P. 364]; *Keller* v. *Markley* (1942), 50 Cal.App.2d 155, 156 [122 P.2d 614.].)

Since, on this appeal, the correctness of the trial court's action is challenged, we give minute consideration to the evidence which was presented, including certain exhibits which we consider vital to a decision upon the questions involved.

█ Defendant Fairbanks, only eyewitness to the collision, was called by plaintiffs under section 2055, Code of Civil Procedure. He testified, in substance, as follows: That when he started out with his load at 9 o'clock p. m., on the night of the collision, he watched a mechanic test the brakes

and he, himself, also tested them and found them satisfactory before starting out; that when he was approximately 160 feet east of the center of the intersection where the vehicles collided (witness indicated the point as F-4 on Exhibit A) he saw headlights back of a school house on Centinela, which he estimated was approximately a quarter of a mile north of the center of the intersection; that in his opinion the car was going twice as fast as he was; that when he was opposite the middle of the building, located on the northeast corner of the intersection he shifted into fourth drive and when he "got to the end of the building" he was going about 30 miles an hour; that he saw headlights "coming down" into Jefferson on Centinela when he was at a point opposite the westerly edge of the building; that it was coming fast and went through the stop sign; that the car was going "better than 50 miles an hour"; that approximately 30 feet east of the center of the intersection (witness indicated this point as F-2) on Exhibit A) he started to turn his equipment to the left, and shortly after he passed the western edge of the building and was approximately 15 feet east of the center of the intersection, he put on his brakes, and was going "About 25 miles an hour"; that his trailer did not go sideways after he started to turn to the left, for he could tell by the feel of the equipment. In explaining damage to the tractor's right front bumper and crushed headlight above the bumper on the right side, Fairbanks testified that the bumper and headlight hit the ground when the tractor went up on its nose. He testified: "Q. What did the front bumper of your tractor hit? A. The only thing I know is when it went up on its nose and hit the dirt. Q. Did you see the front headlight of your car hit another car while you were in that intersection? A. No, sir. Q. Isn't it a fact, Mr. Fairbanks, that your front bumper scraped along the rear left fender of another car which loomed up ahead of you in that intersection? A. Not that I know of, no, sir. Q. By THE COURT: Why did you put on your brakes and do all of these things? A. Because those lights were coming straight at me down Centinela, coming through the stop sign." Fairbanks stated that after the accident the first thing he did was to walk to the rear of the trailer and then to a watchman's shack at the airplane factory, just south of Jefferson and Centinela; that he asked someone where the telephone was and at this time he did not know there was a car underneath his semi-trailer; that he did not look

for a car as he thought the car had glanced off and gone on; that after he telephoned, someone told him the car was under-neath his semi-trailer.

On cross-examination Fairbanks testified that he had driven heavy equipment at various times since 1917 and real heavy equipment since 1927; that he did nothing to cause the trailer and equipment to overturn or "jackknife," the latter of which occurs "when . . . the rear wheels of your trailer either lock or slide and the back end of your trailer comes along to the left or to the right of your cab in an angle like that (indicating)''; that in his opinion the trailer was caused to turn over by the impact of some object against the jeep wheels which threw them out of line and made the trailer go to the left hand angle; that as he approached Centinela he did not see any car close enough on Centinela to require a warning signal of any kind. In describing the movement made by the tractor when it came to a stop he stated, "Well, when it came to a stop, the tractor just went up on its right front fender and bumper pretty near—I thought it was going right straight over and then the weight of the load and the fifth wheel king pin brought it back and stopped it at an angle with its front wheels—I don't know just how high it was off the ground, eight or ten inches off the ground. Q. Both front wheels? A. No, just the left front wheel''; that when he got to the entrance of the intersection, his speed was 30 miles an hour and he immediately started to slow down "from the time I got to the entrance of the intersection, I seen the lights coming so fast I took my foot off the accelerator and started to move over to the south . . . to my left''; that the car made no stop up to the point of collision, nor did it sound any warning or horn and "it was going awfully fast''; that there were no cars to the west and ahead of his equipment; that he saw only one pair of headlights on Centinela at any time.

Among the witnesses called by the plaintiff were Robert E. Franklin, who ran a wrecking yard, and H. G. Pendell, who appeared as an expert. The former testified that he dis-mantled the Oldsmobile involved in this action and that he remembered the motor from the car and that there appeared to be no blemish upon it and he sold it as being in good running condition. H. G. Pendell stated that his business was "automotive," including running a repair shop and doing towing, and that he was also an automobile mechanic; that

he had repaired heavy equipment such as had been described while he was in the courtroom; that he built tractors and operated them on the highway; that he had driven every type of tractor and truck and automobile and piece of equipment that will drive; that he visited the scene of the accident, arriving about 11 p. m. He stated further that after the heavy equipment had been taken away he removed the Oldsmobile from the scene of the accident and took it to his place of business; that although he did not examine the front end of the motor to determine whether the motor had been pushed back he knew the motor had not been pushed back; that at the scene of the accident he removed the drive shaft from the car, and if the motor had been pushed back, this would have been very difficult to do, but as it was, it was removed like any other car; that he examined the fuel pump, which is just back of the motor, and its outside appearance was perfect, there were no breaks or any defect in it; that he drove equipment similar to that here involved for Roberts & Bros. Circus for some months in testing it; that he was with Dundee Motor Truck Company for 7 years and tested trucks for people to whom they were sold; that he was a consulting engineer traveling about the country for the Duplex Company of Lansing, Michigan, another truck company.

On *voir dire* examination by defense counsel the witness testified he had never actually driven a jeep of the type here involved, but had inspected that type; that it had been about 10 years since he had done any engineering in that line of work; that the jeep here involved was a relatively new type; that he was not a graduate engineer. Thereupon the following question was asked: "Q. From your examination of the condition of the tractor and semi-trailer when you got there, did you form an opinion as to what made the semi-trailer go over? A. Yes. Q. And what is that opinion? A. That the truck was turned to the left and then back to the right." Being shown defendants' Exhibit J, and his attention directed to a dark streak at the left end of the front bumper, the witness was asked whether that "wasn't rubber rubbed off on the bumper" and he testified it was impossible to say what made that dark streak; that he never looked for any rubber on the bumper and didn't observe any rubber there. The following testimony thereupon was given: "Q. Now isn't it a fact that if a tractor and equipment of that kind was making a turn, a left oblique and was struck from the right

with force by some object like a car, upon the right wheels or tires of the tractor, the right rear wheels of the tractor and the right wheel of the jeep, would that not cause it to turn over? A. Not while it was going to the left, you couldn't hit it hard enough with a steam engine to pull it over to the right in a 'V' shape. A steam engine would go clear through it . . . before it would turn it back on itself while it was on a 'V' to the left, a steam engine traveling 50 miles an hour. Q. It would be impossible, you would say? A. Yes, that is impossible to turn a 'V' back on itself . . . . Q. As a matter of fact, if it was turned to the right, it would be harder to turn it over—— A. No, turning to the right it would turn itself over just as this one did.''

F. G. Bramble, a licensed surveyor and for many years engaged in the business of making maps and diagrams for use in court proceedings, was called as a witness on behalf of plaintiffs. He identified a map he had prepared of the intersection of Centinela and Jefferson (offered and introduced into evidence as defendants' Exhibit A) and also certain photographs taken of the scene of the accident. On cross-examination this witness stated that at the former trial of the case he had been a defense witness and that he had made the original map and had taken the photographs at the request of defendants; also, that he did not look on Centinela or on the entrance to Centinela from Jefferson for any marks be- cause he was only directed to look on Jefferson. In explaining Exhibit B, a tracing of Exhibit A and drawn to scale, but showing only skidmarks, gouge marks and sideways skid- marks of the type and kind usually found in automobile accident cases, this witness stated: ''The marks which I found there in Jefferson at the intersection were one long set of marks made by a dual wheel, which is a wheel carrying two tires. These began about 2' feet west of the center line of Centinela . . . (and) about ten feet north of the center line of Jefferson. . . . They continue in a long arc for about sixty- five feet to the southerly edge of the pavement. There were two other marks branching off from these marks about mid- way between the easterly and westerly end of the first marks mentioned and running a little to the north of them for a distance of about 22 feet. . . . About seven feet south of the easterly end of the dual marks . . . which extended to the south edge of the pavement, were another set of dual tire marks apparently made by the left wheels of the same vehicle.

That would be the left-hand wheels and they extended for a distance of fifteen feet only. Just south of the most northerly set of the dual tire marks and the longest ones was a heavy mark like a car's tire which was started with a turn at its beginning point at the most easterly end thereof, turning from north and south to east and west, going off in a southwesterly direction, considering Jefferson as running east and west, more west than south. This I have denoted as a tire mark. It was about 22 feet long and was a single mark which was similar to that which would be made by a pleasure automobile, such as the Oldsmobile involved in this accident. It was a tire mark, rubber showing on the pavement. This began about 8 feet west of the center line of Centinela . . . and a few inches south of the longest dual tire mark which I have described, and about 8 feet north of the center line of Jefferson. . . . About mid-distance of this latter mark . . . and about the width of an automobile to the south of it and going in a parallel line to the west and south on an angle more to the west, was another line showing a tire mark about five feet long. This was a single tire mark such as might be made by a pleasure automobile, and seemed to be more of a brush mark. Between this latter mark and the other single tire mark just described, which was 22 feet long, there was another mark extending in practically a westerly direction, turning south and then west, about 40 feet long, beginning near the end of the shortest dual tire mark and continuing across the path of the longest dual tire mark and to the west of it. This was a single mark like that which would be made by a pleasure automobile. To the west of the end of this mark about ten feet there appeared to be two scratches on the pavement which were parallel and about the distance of the width of the ordinary pleasure automobile wheels apart, to-wit: about 4 feet 9 inches or five feet, which extended to the edge of the pavement. At the end of the most northerly of these marks, which marks ran in an easterly and westerly direction and curving to the south, there was an oil spot on the pavement. There was another oil spot on the shoulder as indicated. There was another gouge mark in the intersection and a brush mark about in the center of Jefferson at the end of the lightest dual tire marks and about three feet west of them as indicated.''

In an effort to determine whether any facts were brought out from which Fairbanks might be found to be the respon-

sible cause of this accident, we have examined carefully the settled statement giving particular attention to the testimony of a number of witnesses who were on the scene immediately after the accident and made observations concerning skidmarks and tire marks which were noted both on Centinela Avenue and Jefferson Boulevard. Regardless of where the different witnesses placed the skidmarks or how they described them, we find nothing in all this testimony which would have justified the jury in fixing the blame for the accident upon the driver of the truck or from which it could have drawn inferences favorable to the plaintiffs' cause.

Giving to the plaintiffs' evidence all the value to which it is legally entitled and indulging in every legitimate inference and accepting only that portion of defendant Fairbanks' testimony under section 2055, Code of Civil Procedure, which is most favorable to plaintiffs, as we must do in considering the trial court's action in granting the directed verdict in favor of defendants (*Smellie* v. *Southern Pacific Co.* (1931), 212 Cal. 540, 558 [299 P. 529]), we are of the opinion, after a careful consideration of all the evidence presented in the record before us, that there was no evidence of sufficient substantiality which would support a verdict for the plaintiffs if the jury had been given an opportunity to pass upon the matter. Appellants state that since they produced no eyewitnesses they were ''relying upon photographs taken before the cars were removed from the scene of the accident, the condition of the cars after the collision, and parts of the testimony of Fairbanks, given when he was called under C.C.P. section 2055,'' but we are unable to find in the photographs, after a careful study of them, anything which might support or sustain their contentions or draw from them the inferences which they argue a jury might have drawn from them. Appellants argue unconvincingly that the jury might have inferred from the physical facts surrounding the accident, that the speed of the driver of the truck and trailer was greater than admitted by him and in violation of the basic speed law; that ''the upset trailer under the circumstances, in the absence of a credible explanation, warrants an inference'' that the driver failed to keep his equipment under proper control, and failed to keep a proper lookout.

There was nothing in the proved physical facts which would have justified an inference that the speed of the truck at this open intersection, upon a highway protected by boulevard

stops, was a negligent one or that the driver was inattentive to his duties as he approached the intersection. The upset trailer, in itself, is not a sufficient fact, in the absence of some proof showing negligence on the part of the defendants, upon which to base an inference that the equipment was not properly under the control of the driver. Disregarding that portion of defendant Fairbanks' testimony which placed the position of the Oldsmobile just prior to the collision at a point unfavorable to plaintiffs' case, there is nothing in the evidence presented by plaintiffs which establishes the position of decedent's automobile in relation to defendants' equipment. Without proof of this essential fact how can it be concluded, inferentially, that defendant Fairbanks failed to act as a reasonably prudent person would have acted under the circumstances? ■ While all reasonable inferences are to be drawn from the evidence and all conflicts to be resolved in plaintiffs' favor, nevertheless the inferences cannot be based upon speculation or conjectures, but must be based upon "a fact legally proved." (Code Civ. Proc., §§ 1958 and 1960.) To draw from plaintiffs' evidence the inferences which they would have us draw would be to decide a question upon mere speculation and not upon facts "legally proved."

■ The mere fact that an accident happened in this case is not sufficient, of course, to establish defendants' negligence. The burden rested upon plaintiffs to establish that some act or omission on the part of defendants was the proximate cause of the accident. This burden, as appears from the foregoing résumé of the evidence, the plaintiffs have failed to sustain and their evidence lacks elements of proof essential to support a determination of negligence on defendants' part. This being true, there was no evidence requiring the submission of the case to the jury.

■ We proceed now to a discussion of the other ground of appeal, relating to the court's admission and rejection of certain items of evidence. Among the witnesses called by defendant was Albert H. Ashton, who had been engaged in police work for 22 years, and for over 17 years of that time, as an officer of the California Highway Patrol, had been delegated to investigate traffic accidents. He testified that he went to the scene of the accident shortly after 9 o'clock with another officer and described the conditions which he noted in the highway, remarking upon certain tire marks extending in a southerly direction which led up to or near the

point of impact. He was asked by the court whether, as a traffic expert, he could identify these marks as being made by any particular automobile. He answered "they were made by the Oldsmobile." Counsel for appellants objected "on the ground that question calls for an opinion on the very subject which is going to be left to the jury and no foundation has been laid." We think the objection was well taken but that no prejudicial error arose since Officer Kenezevich, testifying before Ashton, stated, without objection, that the tire marks were made by the Oldsmobile, and Officer Sullivan, testifying after Ashton, gave substantially the same testimony, also without objection. ▊ An effort was made to impeach Ashton by cross-examining him in regard to testimony which he gave at a prior trial respecting the location of the north and south skidmarks and the length thereof and whether or not they came in contact with the east and west skidmarks in the intersection. Reading the record, it appears that difficulty arose in the consideration of this question from the fact that at the prior trial designation of certain points considered important in the inquiry was made merely by a reference "from here to here." The court finally decided that there was so much confusion arising from this attempt at impeachment and the lack of proper identification of the points involved as to warrant him in sustaining an objection to further inquiry. We are satisfied that no error occurred in this regard.

Inasmuch as the plaintiffs, in our opinion, have failed to establish a prima facie case of negligence on the part of the defendants, we need not consider either the question of contributory negligence or the presumption that plaintiff exercised due care for her own safety, for, as the court said in *Keller* v. *Markley, supra,* 50 Cal.App.2d 155, 163-164, these "are issues . . . material to the disposition of this appeal, only in the event that there was sufficient evidence from which a jury might have found, as a question of fact, that defendant was guilty of negligence."

Judgment affirmed.

Shinn, J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied October 25, 1945, and appellants' petition for a hearing by the Supreme Court was denied November 26, 1945. Carter, J., and Schauer, J., voted for a hearing.