[Civ. No. 23081.   Second Dist., Div. One.   Mar. 9, 1959.]

JACK H. TOWT, Appellant, v. H. F. POPE, Respondent.

Orville O. Clarke, Richard Schauer and Ben M. Shera for Appellant.

Moss, Lyon & Dunn, Gerold C. Dunn and Henry F. Walker for Respondent.

LILLIE, J.—Defendant was sued by plaintiff, an employee of Vinnell Company, a corporation, for damages arising out of an industrial injury in its steel plant. Pope, vice president of the corporation, was sued individually although Vinnell Company was not joined as a party defendant, plaintiff having exhausted his remedies against it under the compensation provisions of the Labor Code. The matter was heard by a jury and, at the conclusion of plaintiff's case, defendant's motion for a judgment of nonsuit was granted. It is from this judgment plaintiff appeals.

Taking all of the evidence in favor of appellant as true and disregarding that in conflict, and drawing on appellant's behalf every favorable inference and presumption fairly deducible and arising therefrom (*Raber* v. *Tumin*, 36 Cal.2d 654 [226 P.2d 574]), the following is a fair summary of the pertinent facts.

Defendant Pope was a vice president in charge of the steel division of the Vinnell fabricating plant. Directly subordinate to him and in complete charge of the division was Rene Pfister, his superintendent, to whom he directly gave all orders and instructions. There is no evidence plaintiff ever saw defendant, had any dealings with him, or that he was present at the time of the accident.

Plaintiff started work in the steel division on July 12, 1954, on the swing shift as a "take-off" man on the "46" saw. He was told what to do but given no instructions relative to standing in the stacks, hooking loads of steel, using spreader bars, or giving hand signals. Later he did burring, drove drift pins and ran a punch press. A week or 10 days before the accident, he was assigned to work as a helper with McHammer, an experienced mechanic fitter.

On the night of August 12, 1954, plaintiff and McHammer, fabricating and tack welding base plates on "I" beams, ran out of material. McHammer took him to the center of the bay where they found a stack of eight "I" beams, 40 feet long. The four on top were divided from the bottom four by 4 inches by 4 inches spacers. On top of the stack was a separate steel beam they had to first remove, and McHammer

called over the bridge crane. There were two chains hanging from the hook of the crane and each chain ended in a hook. Plaintiff hooked his chain to the end of the beam, McHammer hooked his to the other end, and the crane lifted it away. When the crane returned, it moved over the stack and again let down the hook with the chains. McHammer attached his hook around the end of the top four "I" beams and plaintiff attached his around the opposite end. Plaintiff did not remember who gave the "up" hand signal to LaPlant, the crane operator, he or McHammer, but plaintiff started walking toward the end of the beams. He said he could have given the signal himself, and he could have done so before or as he was walking, but after walking 10 or 15 feet, the four bottom beams fell onto him, seriously injuring him. The top four plaintiff had hooked onto did not touch him, but the south end of the beams was held in mid-air by the chain hooked around it, attached to the crane; the other end was down, the chain unhooked.

LaPlant, plaintiff's witness, testified that he *centered* the crane above the load and lowered the hook with the chains; that each man hooked his chain around opposite ends of the stock and when they finished hooking, both plaintiff and McHammer gave the standard hand signal to lift up, but that he looked down and shook his head "no"; that plaintiff looked at him, appeared angry and to be talking and again gave the "up" signal; that McHammer, an experienced mechanic fitter, who had previously directed his crane and who had been there all the time with plaintiff and knew his business, was also giving the "up" signal, so he commenced to take the slack out of the chains, moving as slowly as possible; that as he was tightening the chains preparatory to lifting the beams in the air, plaintiff's hook "must have come off" or the chain plaintiff "hooked either slipped or came unhooked" and the stack "creeled" eastward, and it appeared the top stack knocked over the bottom four beams onto plaintiff.

The evidence shows that the men on the night shift received no safety instructions relative to hooking steel or standing in the stacks while the crane was in operation; that although hooktenders worked in the shop on the day shift, none worked at night except in the yard; that if it was necessary to move stacks "everyone" hooked his own load of steel without trouble and no instructions were given that any particular man was to hook or tie loads of steel; that, although it was customary to take orders from mechanics, no instructions were

given that any special worker was to give signals to crane operators; that those with no prior experience learned hand signals by watching others and everyone gave them when it was necessary; and that a copy of the Standard Crane Hand Signals in use by all crane men, printed by the Division of Industrial Safety, was posted on the plant bulletin board.

Except for defendant's testimony that he had nothing to do with plant safety, the only other evidence concerning it related to Pfister's responsibility to establish a safety program and carry it out, and what he did in that regard. Viewing the evidence in the light most favorable to appellant, we make no further comment except to say that defendant gave neither written or oral safety instructions, nor orders to anyone but Pfister, and that he knew of the hiring policy of Vinnell Company to employ inexperienced men with no prior steel experience as helpers.

As to his experience, plaintiff testified he had been a pond engineer for a plywood company, but had operated an overhead bridge crane and learned crane hand signals. He also worked as an erection foreman for the Towt Wind Machine Company. Between July 12 and August 12, he did various jobs in the plant, including work as a helper to Bennett and then to McHammer. Immediately before the accident, plaintiff successfully hooked the chain on the one beam the crane moved away. He could not recall if he had ever seen any of the men hook or unhook loads, although he had often seen the overhead cranes lifting steel and moving it from place to place. He testified he had never hooked a load like this before, although he did know three different ways to fasten hooks on chain, describing them—"bring the chain down and around the load and bring the hook back up and hook it over the chain"; "bring the chain down and around underneath the load and back up again, and (to) put the hook under the chain"; and the method he used on the load in question which he described in precisely the same manner as the customary and proper way outlined by his own expert witness Harris. Plaintiff described the method he used: "I brought the chain down around one side of the "I" beams and brought it across and under the top four where there was a spacer separating it from the bottom four. I then brought the chain up on the other side. I took the hook on the end of the chain and hooked it around the chain, itself." He did not recall if he fixed the hook over or under the chain on the load, but he further testified he attached the hook on the end of the chain "about

the *center* of the web so that the hook was *centered* above the load." Harris described the proper method in the same way: "It is customary in tying loads for the man doing the tying to bring the chain down on one side of the load, around underneath it and back up again. On this end of the chain there is a hook and when it is brought back up on the other side it is hooked back onto the chain, itself. In doing this, the man tries to hook the chain over the *center* of the load." Appellant's reliance upon his inexperience as having made it unsafe for him to act as hooktender, and for the crane operator to rely on his unauthorized hand signals, is misplaced in view of the uncontradicted evidence that plaintiff hooked the load in question properly. If a hooktender does this work, and the record is silent as to what a hooktender's functions and duties are, it is clear from plaintiff's own testimony that any lack of experience on his part had no connection with whether it was safe for him to act as a "hooktender" on the occasion of his injury, for he hooked the load in the proper and customary manner as it should have been done; and there is nothing in the record to show that it was anything plaintiff did or did not do that caused the hook to "come off" or the chain to slip or come unhooked. As to whether plaintiff's inexperience made it unsafe for the crane operator to rely on his "unauthorized" hand signal, it is clear that, although plaintiff may have given the "up" signal too, LaPlant did not lift the load in question until McHammer gave his signal. In any event, plaintiff himself testified that he knew the standard hand signals from having previously operated a crane.

At no time did plaintiff directly testify that he was inexperienced. Of interest is the fact that his own witness Bennett, a fitter, with whom he had worked as a helper, testified in response to plaintiff's own questions on direct examination, that he was a "good and experienced helper."

Appellant contends that (1) there is sufficient evidence in the record that defendant violated a duty of care he owed to plaintiff, (2) the issue of proximate cause should have gone to the jury and (3) the trial court erred in failing to permit his expert to answer several hypothetical questions.

■ Appellant, an employee of the same corporation employing defendant, seeks to establish in defendant, a supervisory coemployee, a personal duty to perform certain acts, and specifically charges that he failed to personally instruct him relative to safety, working in the stacks and hooking

chains, and to provide him with a safe place of employment, in violation of certain nondelegable "duties" imposed upon him as an "employer," under the safety provisions of the Labor Code, Division V (relating to safe employment, safe places of employment and use of safe methods [Lab. Code, §§ 6400-6404]), safety orders issued by the Division of Industrial Safety (div. V, p. 1, § 6500), and the common law.

At the outset, the record shows that Vinnell Company, the employing corporation, carried Workmen's Compensation Insurance; that plaintiff was entitled to its benefits, pursued his remedy against the corporation as his "employer" under the Workmen's Compensation provisions of division IV, Labor Code, and received compensation from its carrier. Having exhausted his remedy against the corporation and being precluded from proceeding further against it (Lab. Code, § 3601; *Scott* v. *Industrial Acc. Com.*, 46 Cal.2d 76 [293 P.2d 18]), plaintiff, seeking additional recovery for the same injury, now resorts to another part of the Labor Code (div. V) relating to safety to establish defendant, a vice president and employee of the employing corporation, as his "employer" and create in him a personal duty to perform the acts mentioned therein. Neither the record before us nor the law of this state supports such a position.

Section 6304, division V, part I, Labor Code, relating to safety, defines "employer" as having the same meaning as in section 3300 under workmen's compensation, and shall also include "every person having direction, management, control or custody of any employment, place of employment, or any employee." Appellant submits that based upon defendant's testimony he was in charge of the Vinnell steel division, he, a "supervisory co-employee" over plaintiff, a "subordinate employee" of the same corporation, became his "employer" under division V and could not delegate any of his duties thereunder relating to workmen's safety. (*Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16 [324 P.2d 657]; *Atherley* v. *MacDonald, Young & Nelson, Inc.*, 142 Cal.App. 2d 575 [298 P.2d 700].)

Defendant Pope, as any like officer in a large corporation, particularly one whose duties require him to be often absent from the plant, could not and did not personally supervise, or give any orders or instructions to, any employee of the 230 working in the steel division. He relied entirely upon his duly constituted plant superintendent, previously appointed by the president, to carry out all orders relative to supervision, work,

equipment, safety, and place of employment. The following chain of command and responsibility at Vinnell Company reveals the unrealistic position appellant assumes in attempting to hold defendant Pope personally liable. The board of directors was the top authority of the corporation. Directly subordinate to it was president Vinnell, under him McNamara, the executive vice-president, and then four vice-presidents, one of whom was defendant Pope. Pope, vice-president in charge of the engineering, purchasing and office departments, the heavy construction division and the steel division, was appointed by, and worked directly under, the president. Subordinate to Pope were two superintendents, one who ran the heavy construction division, and Pfister, who was in complete charge of the steel division. Among the employees under Pfister were five foremen, all his personal appointees, under whom were three leadmen, and then the mechanic fitters, who each had a helper.

Pfister, the superintendent, had authority to hire and fire employees, place them in jobs and tell them what to do. He was responsible for and in charge of plant safety, for carrying out orders directly given by defendant, and instructing the workmen. At no time did Pope ever personally give orders or instructions to anyone else. Defendant was absent a good part of the time, his duties taking him away from California, all over and out of the United States.

Obviously, the purpose of the safety provisions enacted in division V is to provide protection for employees in their work, not to create an additional duty and corresponding personal liability in a supervisory coemployee of an employing corporation. If under the circumstances at bar Pope is to be classified as an ''employer'' of the kind contemplated by the Legislature in enacting the safety provisions in division V, then every elective executive or appointive authority in any employing corporation might well be individually directly responsible to each of its thousands of employees, not for any positive act of negligence, but for every personal omission an employee might claim as a proximate cause of an industrial injury; and individually responsible for the failure of a subordinate down the chain of command to carry out the instructions given to his original agent. It would be virtually impossible for executive officials, presidents, vice-presidents, and managing agents of large corporations to perform any of their regularly assigned duties if they were required to personally instruct each laborer as to work and safety. Of necessity, this

must be left to the superintendent or foreman, and those immediately in control and management of the particular employee, his work and his place of employment. We do not believe under these circumstances the term "employer" under section 6304 can be construed to include a person who exercises only *intermediate* control and neither the immediate direct control of a superintendent or manager, nor the ultimate control of the employing corporation itself, for whose benefit all of the work is done. A contrary construction would do violence to the very purpose and object of the safety provisions of division V.

Appellant relies heavily on *Atherly* v. *MacDonald, Young & Nelson, Inc.*, 142 Cal.App.2d 575 [298 P.2d 700], and *Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16 [324 P.2d 657], the former to show a dual control and agency relationship, which he believes to be similar to the one at bar; and both for the authority that defendant's duties under division V, Labor Code, are nondelegable. We do not question that, if defendant is an "employer" under section 6304, he is unable to delegate whatever statutory duties division V imposes. However, these two cases neither require the finding that defendant is an "employer," nor establish liability against him as a superior coemployee. *Atherley* v. *MacDonald, Young & Nelson*, 142 Cal.App.2d 575 [298 P.2d 700], is not applicable to the factual situation at bar. A building owner and a contractor were sued by plaintiff, an electrical subcontractor's employee, who was injured in a fall on an unfinished stairway in a building under construction, and both held liable because according to the evidence therein, particularly the agreement between the defendant owner and defendant contractor, both had "control" over the stairway. In *Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16 [324 P.2d 657], defendant corporation was sued by a business invitee for a positive act of negligence on the part of defendant's employee, who turned on a switch while plaintiff was inspecting a conveyor belt at defendant's manufacturing plant.

We find no authority for holding a person in defendant's position, who exercises neither immediate nor ultimate control over the workmen and their place of employment, an "employer" under section 6304, division V, Labor Code. In reality, if we were to hold defendant liable for failure to perform certain acts under division V, we would, in effect, be establisihng liability in a vice-president of a corporation (an intermediate superior employee who is superior to his imme-

diate subagent, the plant superintendent, but subordinate to the executive vice-president, president, and board of directors) to a subordinate employee for nonfeasance. The record before us disclaims any positive or overt negligent act on the part of defendant. If he is guilty of negligence it must be based entirely upon his failure to perform a duty. Our attention has been directed to no authority for a cause of action by a subordinate employee against an intermediate coemployee guilty of no positive act of negligence.

In the absence of active participation in an act of misfeasance, generally an officer of a corporation is not personally liable to a third person for nonfeasance. The court in *Mears* v. *Crocker First Nat. Bank*, 97 Cal.App.2d 482 [218 P.2d 91], involving an action in conversion, found a transfer officer and agent of a corporation not personally liable to a stockholder for a failure to transfer stock (nonfeasance) and held that although the failure might be wrongful and subject the corporation to liability, the officer and agent did not personally owe a duty to a third person and that section 2434, subdivision 3, Civil Code, refers only to acts of misfeasance and not nonfeasance (97 Cal.App.2d 491). In *Thomsen* v. *Culver City Motor Co., Inc.*, 4 Cal.App.2d 639 [41 P.2d 597], an action for alleged conversion for selling certain automobiles to which plaintiff's assignor had been given bills of sale as security, plaintiff sued the corporation and two directors, one of whom was a vice-president. The court found no liability on the part of the two directors who had no knowledge of, and did not participate in, any wrongful act. Said the court, at page 644: "While it is true, of course, that directors and officers of a corporation are liable equally with the corporation for its torts in which they participate, it is equally true that if they do not participate therein, and if they are guilty of no culpable negligence in allowing the commission of the wrongful acts, they are not liable."

The federal courts have also recognized the distinction between misfeasance and nonfeasance in holding a superintendent, foreman, or supervisory employee not liable to a subordinate injured employee for failure to perform his master's duty of repair and inspection (*Morefield* v. *Ozark Pipeline Corp.*, D.C., 27 F.2d 890; *Plunkett* v. *Gulf Refining Co.*, 259 F. 968). In the Plunkett case, plaintiff, an employee thereof, sued the corporation and its superintendent. The latter failed to notify plaintiff of a false bottom on a tank of tar. In releasing the superintendent from liability for

personal injuries to plaintiff, a subordinate employee, the court said, at page 971: "The most that the defendant Plunkett could be responsible for is for not telling the plaintiff of this false bottom and that it was likely to fall, and that is clearly nonfeasance. And it is well settled, I think, by the authorities, that for mere nonfeasance an employee of a corporation will not be liable to a third person for injuries received."

Although appellant on oral argument disclaimed the application of the doctrine of *respondeat superior*, we briefly mention it because of the basic relationship between the parties and our conclusion defendant is not an "employer" within the meaning of division V. If, however, defendant is to be classed as a manager or supervisor, who himself committed no positive acts of negligence, but whose subordinate employees (Pfister and those responsible for carrying out his orders) have failed to do certain acts, under prevailing authority there is still no liability to plaintiff. Section 2351, Civil Code, and the cases interpreting the same clearly exempt superior employees from liability from the tortious acts of subordinates. (*Malloy* v. *Fong*, 37 Cal.2d 356 [232 P.2d 241]; *Bowers* v. *Olch,* 120 Cal.App.2d 108 [260 P.2d 997]; *Bond* v. *Pitzer*, 163 Cal.App.2d 1 [328 P.2d 1009]; 33 Cal.Jur.2d, § 110, Master & Servant, p. 541).

The Supreme Court in *Malloy* v. *Fong*, 37 Cal.2d 356, said at page 378 [232 P.2d 241]: "The doctrine of *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees. The supervisor occupies an economic and legal position quite different from that of the employer. It is not the supervisor's work that is being performed, nor does he share in the profits which the employees' conduct is designed to produce. In the usual situation, furthermore, he, like his subordinates, is a wage earner, and he is seldom able to respond in damages to an appreciable greater extent than they. For these reasons, the law has shifted financial responsibility from the supervisor, who exercises immediate control, to the employer, who exercises ultimate control and for whose benefit the work is done. (Citation.) Section 2351 of the Civil Code codifies this principle and has been uniformly interpreted to exempt superior employees from vicarious liability. . . . (Citations.)"

No case cited by appellant deals directly with the primary issue here involved, although he has called our at-

tention to various cases which, because of obvious factual dissimilarities, are not helpful; and extensive comment on the Restatement of the Law of Agency which cannot prevail over statutory provisions. We conclude that as a matter of law defendant personally owed no duty to plaintiff upon which he could predicate an action for negligence.

On the issue of negligence, we refer briefly to the four causes of action in the complaint which alleged substantially as follows: it is "extremely hazardous and dangerous" for employees to work near overhead cranes in operation; to affix hooks and chains to stacks of steel it is necessary for an employee to work in the stacks, and if he remains therein after hooking a load he is exposed to unreasonable risk and harm; crane operators should be directed not to lift steel while employees are in the stacks; the work of stacking steel beams and plate is "highly involved and technical and requires special skills, training and knowledge, and that of affixing chains and hooks is "dangerous and hazardous" if improperly done; Vinnell Company on the night shift, had no hooktender whose sole duty it is to stack steel beams and plates and affix chains and hooks, the work being done by employees without skill, knowledge or training, and reasonable care required hooktenders be employed; the lifting and moving of steel beams 40 feet long require the use of a "spreader bar" to prevent beams from falling, and reasonable care required that they be used; and defendant negligently issued inadequate orders, or orders, that employees work between the stacks after hooking a load while the crane is in operation, that crane operators lift the stacks although employees were present therein, that plaintiff perform the duties of a hooktender, and that 40-foot steel beams be lifted without the use of a "spreader bar."

The record is devoid of any evidence that working near overhead cranes, under the circumstances described, is "extremely hazardous and dangerous," exposed an employee to "unreasonable risk and harm" or constituted a danger; nor could such be inferred from the mere fact that plaintiff was injured. We find nothing in the evidence to the effect that remaining between the stacks created "unreasonable risk and harm" or that crane operators should be directed not to lift steel plate while employees are in the stacks. Although LaPlant was instructed to be careful at all times, "to take it easy," and made no lift of steel over the men without their knowledge and without receiving hand signals

from a leadman, this alone is insufficient to constitute evidence that generally crane operators should be directed not to lift steel while employees are in the stacks. The record is bare of evidence that the work of stacking beams is "highly involved and technical and requires special skills"—on the contrary, it shows that no special instructions were given relative to hooking steel, employees learn from observation, "everyone in the plant" hooked chains, "anyone who wanted to move a load hooked his own load," and "it was customary to let anyone" do the hooking. All learned hand signals by watching others and hooked chains and moved stacks of steel without incident. Absent in the evidence is any complaint concerning these practices, or any finding they were unsafe or in violation of safety orders by an inspector of the State Division of Industrial Safety. Plaintiff's expert Smith testified that, if a safety inspector after inspection makes no objection, the presumption is that the practices in the plant are safe. Nor is there any evidence concerning the functions of hooktenders, what they do, or that reasonable care requires they be employed. The fact they were employed on the day shift is alone not sufficient evidence to show they should have been on the night shift. Although there is testimony "it is customary in the industry to have hooktenders give the signal to the crane operator *if* they were employed," there is no showing they had to be, or should have been, employed. The only testimony relating to "spreader bars" is that given by defendant to the effect they are generally used in the steel industry in lifting steel plate and heavy loads, and were available to Vinnell and used when needed. The record is clear that defendant gave no orders, directions or instructions of any kind, written or oral, adequate or inadequate, to anyone but Pfister. There is no evidence that defendant ever personally ordered plaintiff, or any employee, to work anywhere under any circumstances at any time. This applies with equal force to any allegation that defendant ordered plaintiff or anyone else to perform the duties of a hooktender, or that he gave instructions to anyone relative to when "spreader bars" should be used.

Applying the rules that the burden is on plaintiff to prove the existence of every essential fact upon which he relies (*McKellar* v. *Pendergast*, 68 Cal.App.2d 485, 489 [156 P.2d 950]); "substantial evidence is required to establish each affirmative allegation," and "a scintilla of evidence

is not sufficient for that purpose" (*Oldenburg* v. *Sears, Roebuck & Co.,* 152 Cal.App.2d 733, 741 [314 P.2d 33]) and "(W)hile all reasonable inferences are to be drawn from the evidence and all conflicts to be resolved in plaintiffs' favor, nevertheless the inferences cannot be based upon speculation or conjectures, but must be based upon 'a fact legally proved.'" (Code Civ. Proc., §§ 1958, 1960; *Farmer* v. *Fairbanks,* 71 Cal.App.2d 70, 80 [162 P.2d 26]), we are satisfied that plaintiff has not sustained his burden of establishing by evidence of sufficient substantiality that any act or omission of defendant constituted actionable negligence. In fact, the record reveals such a lack of evidence supporting plaintiff's allegations of negligence as would more than justify the trial court in taking the case from the jury.

▮  Our conclusion is the same on the issue of proximate cause. Plaintiff not only had the burden of establishing actionable negligence, but that it operated as a proximate cause of his injury. This cannot rest on guess, conjecture, speculation or surmise, and must be established by substantial evidence (*Petersen* v. *Lewis,* 2 Cal.2d 569 [42 P.2d 311]; *Union etc. Co.* v. *San Francisco Gas etc. Co.,* 168 Cal. 58 [141 P. 807]; *Puckhaber* v. *Southern Pac. Co.,* 132 Cal. 363 [64 P. 480]; *Delk* v. *Mobilhomes, Inc.,* 118 Cal.App.2d 529 [258 P.2d 75]).

▮  As to why the beams fell, the most the evidence establishes is that while the crane operator was tightening the chains preparatory to lifting the top stack in the air, plaintiff's hook "must have come off" or the chain plaintiff "hooked either slipped or came unhooked," the top stack knocking the botttom one onto plaintiff. The record likewise shows without contradiction and from plaintiff's own testimony that in hooking the load in question, plaintiff did so in precisely the exact manner his expert witness described was the customary and proper way a load should be hooked. In view of this evidence, and the lack of any proof as to why the hook came off or why the chain slipped or came unhooked, it is obvious no proximate cause could arise either from any failure to instruct plaintiff in hooking or because of his inexperience. For the same reason, any failure to provide hooktenders could not have been a proximate cause, even considering plaintiff's expert who testified it was not a common practice and did not conform to standards to permit an "inexperienced" man to hook beams. The record does not

disclose a hooktender's duties, nor is there any proof that had one been present the accident would not have occurred, since plaintiff centered and properly hooked the load in question. The same applies with equal force to the giving of signals to the crane operator. Having operated an overhead bridge crane, plaintiff knew the standard signals but of more importance is the uncontradicted testimony of LaPlant that although both gave the "up" signal, he did not lift the load in question until McHammer gave the signal the second time. He actually took the signal from a "qualified" employee. As to a "follow up on safety," there was no evidence that had defendant personally done so the injury would or could have been prevented.

The evidence does not reveal the cause of the fall of the lower stack on plaintiff except that the hook came off, or the chain slipped or came unhooked, none of which has been shown to have been proximately caused by any of the matters charged. We are satisfied there was not sufficient substantial evidence establishing proximate cause requiring the submission of the case to the jury.

Appellant's last point concerns the trial court's rulings on objections to four hypothetical questions, propounded to plaintiff's expert. To each question an objection was interposed by defendant and sustained. In no instance did plaintiff make an offer of proof as to what answer the witness would have given.

The first question related to whether it was a safe practice to permit a fitter's inexperienced helper to hook chains around a load of 40 foot "I" beams. Among others, the objection was that the question invaded the province of the jury. An expert cannot, as a general rule, be questioned as to whether certain methods are prudent, or machinery or conditions safe, as invading the province of the trier of fact. (*Sappenfield* v. *Main St. etc. R. R. Co.*, 91 Cal. 48, 59 [27 P. 590] ; *Luman* v. *Golden Ancient Channel M. Co.*, 140 Cal. 700 [74 P. 307]).

The same applies to the question relating to whether it was within the safe practices of the community "to require and permit" an inexperienced man working in a steel fabricating plant to give signals to crane operators to lift and move loads. We also fail to see the materiality of the answer, assuming it to be in the negative, for there was no evidence plaintiff was required to give any signal, and although permitted to do so, he not only knew the standard hand signals

but the crane operator would not, and did not, proceed to lift the load until a "qualified" mechanic also gave the "up" signal, which he followed.

Concerning the question as to the custom in the Los Angeles area concerning a new employee reporting to work in connection with safety instructions; besides appearing to be completely outside the issues raised by the pleadings, appellant is in no position to complain of the ruling, for there is nothing in the record to show that the answer to the question would have been in his favor. He made no offer of proof and we have no way of determining whether the evidence would have been beneficial to him. (*Hogan* v. *Miller*, 153 Cal.App.2d 107 [314 P.2d 230] ; *Ogden* v. *Title Ins. & Trust Co.*, 129 Cal. App.2d 26 [276 P.2d 146] ; *Duff* v. *Schaefer Ambulance Service, Inc.*, 132 Cal.App.2d 655 [283 P.2d 91]), nor can we assume that the answer would have been favorable to him (*MacDonnell* v. *California Lands Inc.*, 15 Cal.2d 344 [101 P.2d 479]).

Without repeating the matters heretofore discussed in connection with the other three questions, we find no error in the court's ruling sustaining the objection to the question whether the failure to use hooktenders on the night shift in a plant similar to Vinnell Company conforms to the practice in the Los Angeles area.

For the foregoing reasons the judgment is affirmed.

White, P. J., and Fourt, J., concurred.