[Civ. No. 9832.   Third Dist.   Sept. 7, 1961.]

KENNY DALE JACKSON et al., Minors, etc., Appellants,
v. GEORGIA-PACIFIC, INC. (a Corporation) et al.,
Respondents.

P. M. Barceloux, Burton J. Goldstein, Goldstein, Barceloux & Goldstein and Reginald M. Watt for Appellants.

Peters, Peters & Hoffman, Partridge, Clewe, Blade & McDonald and Robert V. Blade for Respondents.

Fitzwilliam, Memering & McDonald as Amicus Curiae on behalf of Respondents.

PEEK, J.—The plaintiffs, all minors, by and through their guardian *ad litem,* appeal from an adverse judgment in an action brought to recover damages for the wrongful death of their father, David Jackson, who drowned while working on a log pond operated by his employer, Feather River Pine Mills, Inc.

At the time of his death, Jackson was working the night shift. His job required him, from his position on a float in the millpond, to push logs onto a slip which carried them into the mill. To do this, he used a "pike pole," which he would jab into the log in order to steer it onto the slip. The float upon which he worked was securely anchored to the bed of the pond, some 60 or 70 feet from the shore where the water was approximately 10 feet deep.

On the evening of the fatal accident, Jackson, in the course of his work, jabbed a log too high, lost his balance and fell

into the water. Another employee tried to rescue him, but he slipped from the employee's grasp and was drowned. Artificial respiration was administered, but by the time the fire department arrived with a resuscitator and a physician arrived at the scene, Jackson was dead.

This action was then instituted by plaintiffs against Georgia-Pacific, Inc.; Feather River Pine Mills, Inc.; Inman-Poulson Timber Company; Frank Lisbon, general manager; Hilman Nugent, plant superintendent; Chester Reynolds, day mill foreman; and Ralph Roberts, night mill foreman, of Feather River Pine Mills, Inc., respectively.

Prior to trial, the action was voluntarily dismissed as to all except the individual defendants. Hence, this appeal is only concerned with the judgment as it affects them.

The theory of the plaintiffs in the trial court, as well as here, was that the individual defendants were guilty of negligence in that they breached both their common-law duty to provide a safe place of employment for decedent and the duty not to require him to work in an unsafe place, as well as their statutory duty as "employers" under section 6304 of the Labor Code. Their primary attack is directed at the following instructions, which were given by the trial court.

"You are instructed that no defendant employee can be held liable unless he committed a positive, direct and affirmative act of negligence which proximately caused the decedent's death. Again, I will call your attention to the fact that negligence may consist of a negligent act or negligent omission under the definition heretofore given to you at length."

"You are instructed that a supervisory employee is not personally liable to the children and heirs of a deceased employee for failure to provide said deceased employee with a safe place to work."

"It is undisputed that defendants, Hilman Nugent, and Ralph Roberts were each employed by Feather River Pine Mills Company, acting in the scope of their respective employments and as such were agents of such Feather River Pine Mills Company at the time said decedent met his death. Each defendant, as such agent, may be liable to plaintiffs for any negligent or wrongful act that is proved to be a proximate cause of the death in this case. A failure of an agent to provide a safe place to work or to secure any particular safety equipment that might be deemed advantageous or useful does not support a civil action for damages in the circumstances disclosed by the evidence in this case."

"In view of the circumstances disclosed by the evidence in this case, Ladies and Gentlemen of the Jury, you are instructed to return a verdict in favor of defendants Mr. Frank Lisbon and Mr. Chester Reynolds. Directing such verdict however, should not be taken by you as inferring either that a verdict against the other two defendants, one or both of them, is or is not proper; their liability is determined under the evidence and in accordance with the law stated to you."

It appears from the testimony of Lisbon, the general manager, when called as a witness under section 2055 of the Code of Civil Procedure, that he did not actually hire laborers and knew of Jackson's employment only from personnel records; that while in a "general sense" the overall safety of the personnel at the mill was under his direction and control, the details were not; and that the safety practices on the log pond at the time of the fatal accident were under the control of the night foreman, Roberts. Lisbon further testified that Nugent, the plant superintendent, and both Reynolds, the day foreman, and Roberts, the night foreman, had authority to requisition safety devices without consulting him; that such devices could include a mechanical resuscitator, which was not at the plant at that time; that there were no life preservers or life vests available at the float, nor was any such equipment intended for use by the men working on the float; that had any such item been requested by the foreman and the order approved by Nugent, it would have been purchased; and that the foremen were supposed to instruct the employees as to safety methods.

Defendant Nugent was also called under section 2055, and testified that he was in charge of the entire operation of the plant; that Jackson had been hired by Roberts with his approval. His testimony concerning lifesaving equipment and where it was placed about the pond was essentially the same as Lisbon's. Additionally, he testified to plant procedures concerning safety; that a committee composed of Lisbon, the foremen, and other key personnel periodically inspected the plant; and that at the time of the fatal accident they were following previously approved safety procedures. Nugent's testimony in this regard was corroborated by one Brown, a safety engineer for the insurance company which carried the workmen's compensation policy on the plant. Brown also testified he had never advised the company that it should supply any of the safety devices previously mentioned.

Roberts, when called as a witness under section 2055, testified that he was foreman of the entire plant, which included the pond; that he gave no safety instructions concerning equipment; that there were pike poles and ropes on the float, but they were not for safety purposes; and that he had never requested any lifesaving equipment prior to the time of the accident. He also testified that where Jackson fell, the water was so dirty that it would have been impossible to see him. Additionally, he stated that artificial respiration was used on Jackson from the time he was pulled out of the water until the firemen arrived with a mechanical resuscitator. The testimony as to the time when Jackson fell into the pond and the time when the firemen arrived with the mechanical resuscitator ranged from approximately one-half hour to more than an hour. Roberts also testified that the mill nurse, who was at the scene, stated that Jackson had a pulse at approximately 9 p. m., or nearly one hour after he fell into the pond.

Reynolds, when called under section 2055, testified that he was away from the plant at the time of the accident; that he was day foreman, or superintendent, and had no connection with the night shift; that no lifesaving apparatus was intended for the men on the float; that he had not requested lifesaving equipment and did not know of any request ever having been made for such equipment, nor had he ever discussed the same with his immediate superior, Nugent.

From the record, as summarized, it would appear that Reynolds, the day foreman, was the only one of the four individual defendants who had nothing whatsoever to do with the activities of the night shift. As to the remaining defendants, Lisbon was in a "general sense" responsible for the safety of the entire plant personnel, while Nugent and Roberts apparently were responsible for the details by which such safety measures, if any, were carried out.

As pointed out in *Towt* v. *Pope,* 168 Cal.App.2d 520 [336 P.2d 276], if coemployees were to be regarded as employers they would be subject to the duties and obligations of the master without benefit of the economic rewards which could be obtained from the enterprise and therefore, such a construction of section 6304 of the Labor Code was obviously unfair and could not have been within the contemplation of the Legislature when it adopted its definition of an employer, as set forth in that section.

However, that is not to say that a supervisory employee may not be liable to a coemployee working under him.

■ The rule which makes one employee liable to another employee for injuries occasioned by the former's negligence while both are engaged in a common employment is predicated upon the duty which one owes to the other. (35 Am.Jur. 956.) Or, as stated in 20 American Law Reports 155: ". . . the fundamental question which must ultimately furnish the rule of decision in this class of cases is whether or not a servant owes a duty to the person injured. If he does, he is liable; if he does not, he is not liable.''

■ Defendants, however, contend that such duty relates only to acts of misfeasance and not to nonfeasance; hence, the court was correct in the instruction which it gave to the jury. We are inclined to agree with plaintiffs that such a distinction is both invalid and immaterial. We find nothing in the Towt case to the contrary. There the court held that if the manager Pope was to be held for negligence it must be based on ''his failure to perform a duty.'' (*Towt* v. *Pope, supra,* p. 530.)

It should be noted that what we have said heretofore is not to be confused with the duty of the true employer to maintain a safe place of employment. What we refer to was the duty of Lisbon, Nugent, and Roberts to make certain the decedent was not required to work in an unsafe place. Mechem on Agency states the rule as follows:

''So the managing agent of a lumber company having full charge and control of its mill and machinery and in assigning employees to work at various machines, is personally liable for an injury caused by setting an inexperienced and ignorant employee at work upon a dangerous machine.

''So an agent having complete control and management of a mine with power and authority to do whatever is reasonably necessary to prevent injury from its operation is personally responsible for an injury caused by his neglect to take necessary precautions against the accumulation of dangerous gas therein.'' (Mechem on Agency [2d ed.] § 1477, p. 1097.)

We find nothing to the contrary in the cases of this state cited by defendant. In fact, no case has been cited by either party which is directly in point or which commits this state to either rule. The cases from other jurisdictions which have dealt with this question appear to be fairly evenly divided. (See generally 35 Am.Jur. 956, 957; 57 C.J.S. 347; and 20 A.L.R. 152.) However, '' . . . they are in quite general accord that the negligent servant is liable so long as the duty to the other servant exists.'' (99 A.L.R. 424.) Illustrative of the rule, the annotation cites the case of *Givens* v. *Savona Mfg.*

*Co.* (1928), 196 N.C. 377 [145 S.E. 681], where it was held that:

"The superintendent and foreman of a cotton factory are jointly liable with their employer for damages in case of injuries to another employee as a result of their negligence (1) in failing to exercise due care to provide for him a reasonably safe place in which to work; (2) in ordering and requiring him to work in such place when they knew it was not a safe place; and (3) in failing to instruct him with respect to the dangers incident to the work."

It should also be noted that in many of the states denying liability under circumstances similar to those presented herein, the basis for such denial is specific statutory prohibition. It should further be noted that the legislature of this state has not seen fit to enact comparable Legislation. (E.g., see Lab. Code, §§ 3852 et seq.; *Thompson* v. *Lacey,* 42 Cal.2d 443, 445 [267 P.2d 1].) Hence, plaintiffs' action was in no way limited by statutory enactment.

Plaintiffs' second contention is that the specific statutory standards of care which have been created cast the duty to conform therewith not only upon the real employer, but also upon others whose relationships to and within industry are such as to reasonably justify their inclusion within the class of those required to conform to such statutory standards. Thus, section 6304 of the Labor Code declares that in addition to the definition of "employer," found in section 3300 of the code, employers shall include "every person having direction, management, control, or custody of any employment, place of employment, or any employee."

Having so defined employer, the Legislature proceeds in following sections to lay special duties upon all those who come within the definition of employer as contained in section 6304, all of which special requirements and duties have to do with the general subject of safety in employment. Those who are the subject of the legislative concern are declared to include "every person who is required or directed by any employer, to engage in any employment, or to go to work or be at any time in any place of employment." (Lab. Code, § 6305.) Among the duties laid upon employers relative to the safety of employees in employment are the following: "No employer shall require, or permit any employee to go or be in any employment or place of employment which is not safe." (§ 6402.) No employer shall fail or neglect to provide and use safety devices and safeguards, or to adopt and use methods

and processes reasonably adequate to render the employment and place of employment safe, or to do any other thing reasonably necessary to protect the life and safety of employees. (§ 6403.)

By virtue of such provisions, general manager Lisbon, plant supperintendent Nugent, and night foreman Roberts, were all required to conform to such legislative standards as a duty which each owed to his subordinate employees. The log pond and the platform on which decedent worked were parts of an integrated process for the manufacture of lumber from logs brought to the pond. All three defendants knew the work decedent was required to do, the place where he was required to go to do that work, and the attendant danger that in performing the work he might accidentally fall into the surrounding water and be drowned.

It is clear from the evidence that even if no safer method or plant design than those in use were reasonably practicable, nevertheless, the jury could have found that by adopting the same safety devices for the use of decedent as were adopted for his fellow workers on the pond the danger could have been mitigated. The jury, from the evidence, also could have found that other devices and safeguards to mitigate danger should have been adopted and used. Whether or not, under all the circumstances, all or any of these supervisory employees failed in their duty to decedent was a question of fact for the jury under the evidence in the case, and the jury should have been instructed, as requested by plaintiffs, that:

"By law, certain specific responsibilities for safety on the job are assigned to the employer, but an employer for the purposes of assigning responsibility for safety on the job is defined quite differently than an employer for other purposes.

"An employer for the purpose of assigning responsibility concerning safety on the job includes every person having direction, management, control or custody of any employment, place of employment, or any employee.

"Thus, a person ordinarily considered an employee, is an employer for the purpose of assigning responsibility for safety on the job if such person has direction, management, control or custody of any employment, place of employment or any employee."

The trial court was further asked to read to the jury sections 6400, 6401, 6402, 6403, 6310, 6311, and 6404 of the

Labor Code. These instructions were refused and under the circumstances of this case this likewise was error.

The judgment is reversed.

Van Dyke, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied October 2, 1961, and respondents' petition for a hearing by the Supreme Court was denied November 1, 1961.