Shirley A. DUNN, Plaintiff and Appellant,

v.

McKAY, BURTON, McMURRAY & THURMAN, a Partnership, Daniel England, and Salt Lake County Legal Services, a corporation, Defendants and Respondents.

No. 15208.

Supreme Court of Utah.

Sept. 15, 1978.

Samuel King of King & Schumacher, Salt Lake City, for plaintiff and appellant.

H. Wayne Wadsworth of Watkiss & Campbell, Stephen B. Nebeker, Kipp & Christian of J. Dennis Frederick, Salt Lake City, for defendants and respondents.

CROCKETT, Justice:

Plaintiff, Shirley A. Dunn brought this action for malpractice against defendants, Daniel England and the law firm of McKay, Burton, McMurray & Thurman (hereinafter McKay); and Salt Lake County Legal Services, for their alleged negligent representation of her in a divorce action. After the presentation of the plaintiff's evidence, the trial court granted the motion of the defendants for a directed verdict. Plaintiff appeals.

The plaintiff makes no complaint about the granting of the divorce, for which purpose her husband initiated an action in Florida, and she engaged defendant England and commenced one in Utah. Her complaint is that the defendant England mailed the complaint and summons personally, instead of having the clerk mail it as provided in Rule 4, U.R.C.P.,[1] thereby delaying the Utah divorce proceedings. The damages plaintiff seeks are for the alleged loss of custody of the children and cost of legal counsel in Florida.

In September 1974, plaintiff, her husband, John Dunn, and their two children, Katherine and Samantha, moved from Florida to Salt Lake City where she had obtained a position as director of a vocational school. Her husband had been unemployed during 1974 as the result of injuries he had sustained in an industrial accident. In October of 1974 Mr. Dunn returned to Florida and filed for a divorce in December of that year.

The plaintiff then contacted Mr. England, who was then associated with the McKay firm and paid him a $75 retainer fee. Mr. England contacted counsel in Florida and, through his cooperation, Mr. Dunn's action was dismissed on the ground that he did not then have the six month residence requirement in Florida.

Mr. England then filed a complaint in Utah seeking a divorce and custody of the children for the plaintiff. After an unsuccessful attempt to have John Dunn served personally in Florida, he proceeded pursuant to Rule 4(f)(2) of U.R.C.P.[2] and obtained an order for service by mail. But instead of having the clerk mail the summons and complaint, he mailed it himself on February 6, 1975.

In February 1975, Mr. England left the McKay firm and became associated with another. With the consent of the McKay firm, he took plaintiff's file. When plaintiff contacted him in March 1975 he informed her that under the policy of the new law firm he could not proceed with her case until she paid him an additional $200; which she did not do.

In April 1975, plaintiff was operated on for the removal of blood clots on her spine. In her deposition, the plaintiff testified that while she was hospitalized, her employer, who had been taking care of the two daughters told her that he could no longer care for them. He suggested that inasmuch as the plaintiff had no relatives in Salt Lake, the possibility of placing them in a foster home should be considered. Plaintiff said that, though she did not want the girls to go to Florida, that was better than placing them in a foster home and was therefore her only rational alternative. After the girls arrived in Florida, the plaintiff's husband was awarded custody in a divorce proceeding he initiated there.[3]

■ In seeking the solution to the problem here presented it is appropriate to inquire as to what the plaintiff's position would have been if the summons referred to had been mailed in accordance with the rule, as compared to her present position. The only reasonable conclusion to be drawn, even from the plaintiff's own deposition, is that she agreed to send her children to their father in Florida. Furthermore, they were

1. Rule 4(f)(2), U.R.C.P. provides that where summons cannot be served personally that ". . . the court may order that service of summons shall be given by the clerk mailing a copy of the summons and complaint to the party to be served . . .."

2. See note 1 above.

3. We have stated only what we regard as the essential facts, but they are amply supplemented in the dissent, to which we make reference.

sent there by the earliest date she could have obtained a default divorce.[4] (This is said in full sympathy for her in the unfortunate circumstances which impelled that decision, for which she is neither to be blamed, nor censured.) Nevertheless, the critical and undeniable fact is that it was plaintiff's own conduct which removed the children from the jurisdiction of the Utah court and permitted the Florida court to deal with their custody.[5] Jurisdiction of our Utah courts to make an award in favor of the plaintiff would have to depend either upon in personam jurisdiction over the defendant, or upon presence of the children here.[6] No pretense is made as to the former and therefore there could not be any judgment against the defendant for support money.

It is not questioned that there is an implied covenant in an attorney's relationship to his client that he will represent the client's interest with competence and diligence. Under the granting of the defendants' motion for a directed verdict it is to be assumed (without necessarily being so found, because it is immaterial to our decision herein) that Mr. England was negligent in not following the rule above referred to, and also that the other named defendants of the law firm would be responsible for Mr. England's conduct.[7] Proceeding on those assumptions, the problem of more critical import, and which we see as controlling in this case, is whether the trial court was correct in ruling that the plaintiff's evidence failed to establish a cause of action because it showed no damage to the plaintiff proximately resulting from Mr. England's conduct.[8]

A finding of such damages cannot properly be based on speculation or conjecture.[9] They can be awarded only if there is a basis in the evidence upon which reasonable minds acting fairly thereon could believe with reasonable certainty that the plaintiff suffered injury and damage and also that it was proximately caused by the negligence of the defendant.[10]

In further analyzing the problem, other aspects of the total situation are to be taken into account. These girls were not what we usually regard as "children of tender years." The youngest, Samantha was born June 25, 1965 (now 13) and the oldest, Katherine, was born May 1, 1963 (now 15). They were thus both then of sufficient age that their choice of the parent they desired to reside with would be an important factor to consider. Under the circumstances shown, including the plaintiff's illness, the attitude of the girls, and of the defendant as explained below, it would be a matter of conjecture as to what judgment might have resulted as to the custody of these girls.

---

**4.** Section 30–3–18, U.C.A.1953, provides that, unless good cause is shown and the court otherwise orders, no hearing for a decree of divorce shall be held until 90 days after the complaint is filed.

**5.** *Smith v. Davis,* Fla.App., 147 So.2d 177 (1962); *Mirras v. Mirras,* Fla.App., 202 So.2d 887 (1967); *Periolat v. Periolat,* Fla.App., 336 So.2d 1256 (1976). In the *Smith* case, at 179, it was stated that the child's physical presence was necessary for an adjudication of custody.

**6.** In *Hathaway v. Hathaway,* 24 Utah 2d 118, 466 P.2d 842 (1970), we held that the local forum, because of the presence of the child, was the proper one to determine the issue of custody. But we have also recognized that jurisdiction to award custody may exist on the basis of the child's domicile, *McLane v. McLane,* Utah, 570 P.2d 692 (1977); *Plumb v. Plumb,* Utah, 555 P.2d 1205 (1976).

**7.** If on the basis of that assumption, there was a violation of duty to the plaintiff, but without causing her actual damage as discussed herein, there should be no reversal for nominal damages only. See *Commonwealth National Bank v. Kennedy Company,* 29 Utah 2d 83, 505 P.2d 298 (1973).

**8.** 7 Am.Jur.2d, Attorneys at Law, section 188; *Hansen et al. v. Wightman et al.,* 14 Wash.App. 78, 538 P.2d 1238 (1975).

**9.** *Lindsay v. Gibbons and Reed,* 27 Utah 2d 419, 497 P.2d 28 (1972); *Sumsion v. Streator-Smith, Inc.,* 103 Utah 44, 132 P.2d 680 (1943); *Towt v. Pope,* 168 Cal.App.2d 520, 336 P.2d 276 (1959).

**10.** *Lindsay v. Gibbons and Reed,* supra note 7; *Coon v. Ginsberg,* 32 Colo.App. 206, 509 P.2d 1293 (1973); *Harding v. Bell,* 265 Or. 202, 508 P.2d 216 (1973).

The attitude of the father about their custody is made plain in his communications to the plaintiff and in his deposition. He explained that "I told them [the two daughters] that I could not force either of them to be where they don't want to be, and I still feel that way. I don't think anyone should have to be where they don't want to be." He reiterated several times that the girls could go back to their mother whenever they desired. Corroborative of this is the fact that the younger Samantha, did return and now lives with her mother, under the condition that the defendant will send such support as he desires. Therefore, as to her, this is the same as the best arrangement plaintiff could have obtained under a Utah decree. As to the older, Katherine, she wanted to stay with her father, where she now is, but she is and has been at liberty to come to her mother whenever she desires.

In view of the facts above recited: that the plaintiff could not have obtained in personam jurisdiction over her husband, nor any judgment for alimony or support money from him, and the practical situation as it existed and now exists with respect to custody of the girls, it is our judgment that the trial court was correct in its view that there is no foundation in the evidence upon which reasonable minds acting fairly thereon could find that defendant England's personal mailing of the summons and complaint, instead of having the clerk do it, was a proximate cause of any damage to the plaintiff. For the same reasons: that it was plaintiff's own doings which placed the children within the jurisdiction of the Florida court, plus the fact that her husband had started an action in Florida before the plaintiff commenced hers in Utah, so it appears that there was going to be dual litigation anyway, we do not see how plaintiff's incurring lawyer's fees in Florida can justly be charged to the defendants' conduct.

In consequence of what has been said herein, the trial court was justified in granting the defendants' motion for a directed verdict.

Affirmed, the parties to bear their own costs.

ELLETT, C. J., and HALL, J., concur.

MAUGHAN, Justice (dissenting):

For the following reasons, I dissent.

It is necessary to reiterate the facts in order to compensate for omissions in the majority opinion, and to perceive the events on a sequential basis.

Plaintiff initiated an action for legal malpractice against defendants for their allegedly negligent representation of her in a divorce action.

The matter was tried before a jury; however, after plaintiff had presented her case, defendants moved for a directed verdict. Defendants successfully urged that conceding the issue of negligence for the purpose of the motion, plaintiff had failed to establish the elements of proximate cause and damages. The trial court granted the motion and entered judgment for defendants. Plaintiff appeals. The judgment in favor of Legal Services should be affirmed. The judgment in favor of England and McKay should be reversed, and the cause remanded for trial in accordance with this dissent.

In September 1974, plaintiff, her husband, and their two minor daughters, Katherine and Samantha, moved to Utah from Florida. Plaintiff came to Utah because she had obtained employment in Salt Lake City, as director of a vocational school. Her husband had been unemployed during 1974 as the result of injuries he had sustained in an industrial accident. On October 16, 1974, Mr. Dunn returned to Florida, where he filed for a divorce in December 1974.

Plaintiff had become acquainted with England when she purchased a dishwasher from him. England, who had been admitted to the bar in September 1974, was employed as an associate by McKay. Plaintiff contacted England for legal assistance. England was employed by McKay on a straight salary basis, and any business generated by him was billed by the firm. The trial court restricted the admission of evidence as to the terms of the contract, but it appears from the record the personal rela-

tionship of attorney and client was established between plaintiff and England. McKay urges its liability, if any, to plaintiff was vicarious, as the employer of England. However, a retrial should be granted so that the plaintiff could have the opportunity to establish with whom she sustained the attorney-client relationship.

Plaintiff paid McKay a $75 retainer. The remainder of the fee was to be paid on a "good faith" basis. Plaintiff was temporarily in a financially precarious position because of previous obligations, but her remunerative employment indicated a long term sound financial basis. England procured counsel in Florida and through a cooperative effort Mr. Dunn's action for divorce in Florida was dismissed on the ground he had not been a resident of Florida for six months, viz., they proved his move to Utah constituted a change of domicile.

England filed a divorce complaint on behalf of plaintiff, seeking custody of the children, on January 20, 1975, in Utah. England was unsuccessful in an attempt to have John Dunn served personally by a sheriff in Florida. England consulted with Steven McMurray, a partner in the McKay firm, who suggested making service by mail pursuant to order of the court. England proceeded pursuant to Rule 4(f)(2), U.R.C.P., and prepared a petition and order to permit service by mail. However, England did not adhere to the provisions of the rule which require the clerk to mail the summons and complaint. He mailed it himself on February 6, 1975. Furthermore, he failed to prepare an affidavit of proof of service as provided in Rule 4(g)(3), U.R.C.P.

On February 21, 1975, England terminated his employment with the McKay firm and became an associate in another law firm. With the consent of a partner of the McKay firm, England took plaintiff's file. When plaintiff contacted the McKay firm, she was referred to England's new office. Plaintiff contacted England in March 1975, England informed her that under the policy of the new law firm, he could not proceed with her case until she sent him a retainer of $200.

Plaintiff, in her brief, must refer to the depositions to set forth the facts occurring after February 21, 1975, since the trial court ruled that evidence concerning contacts with England after that date were not material to the lawsuit. This ruling, as will be subsequently explained, was erroneous in regard to England's duty to plaintiff. (If upon retrial plaintiff could establish her contract to procure a decree of divorce in Utah was with the McKay firm with whom she established a personal attorney-client relationship, the duty would remain with the McKay firm. McKay contends plaintiff elected to remain England's client after he terminated with McKay; these evidentiary facts could be established on retrial.)

In April 1975, plaintiff was hospitalized; she underwent major surgery for the removal of blood clots on her spine on April 16. While she was hospitalized, plaintiff's employer had been caring for the two daughters. The employer found it impossible to continue this task. He contacted Mr. Dunn in Florida and arranged for the girls to join their father. Plaintiff was informed of these arrangements and contacted England to express her concern over the potential difficulty in procuring the return of the children. England took no action. The children left Salt Lake on April 20, 1975, the exact day of the expiration of the ninety-day period under Sec. 30–3–18.[1]

On May 23, 1975, John Dunn, having established his six months residency in Florida, refiled his complaint for a divorce. Plaintiff was served in early June, while convalescing at home; she contacted England, who referred her to Gordon Esplin at Legal Services. England delivered the file to Esplin. Plaintiff met personally with Esplin, and the attorney-client relationship was established on June 19, 1975.

---

1. "Unless the court, for good cause shown and set forth in the findings, otherwise orders, no hearing for decree of divorce shall be held by the court until 90 days shall have elapsed from the filing of the complaint, provided the court may make such interim orders as may be just and equitable."

The Florida pleadings indicated that Mr. Dunn could obtain judgment after June 30, 1975. Mr. Esplin arranged a special setting for hearing plaintiff's divorce action on June 24, 1975. At the hearing, the trial court refused to grant plaintiff a decree of divorce because the file did not contain an affidavit proving service of process as required by Rule 4(g)(3), U.R.C.P. However, the trial court took and preserved plaintiff's testimony so the decree could be entered immediately upon procuring the necessary affidavit. Mr. Esplin contacted England and requested that he prepare the affidavit of service. Mr. Esplin encountered some difficulty in procuring the affidavit from England; he finally went to England's office and received it about June 30, 1975. Mr. Esplin took the affidavit to the trial court, which refused to enter the decree because the service and affidavit were not in accordance with the rules, viz., England had mailed the summons and complaint.

Rule 4(f)(2), U.R.C.P. provides:

In circumstances described in (1) above justifying service of summons by publication, if the party desiring service of summons shall file a verified petition stating the facts from which the court determines that service by mail is just as likely to give actual notice as service by publication, the court may order that service of summons shall be given by the clerk mailing a copy of the summons and complaint to the party to be served at his address, or his last known address. Service shall be completed ten days after such mailing.

Rule 4(g), U.R.C.P. provides:

Within 5 days after service of process, proof thereof shall be made as follows:

.     .     .     .     .

(3) . . . and an affidavit by the clerk of the court of a deposit of a copy of the summons and complaint in the post office as prescribed by subdivision (f) of

this rule, if such deposit shall have been made.

At the trial, two local attorneys testified England's failure to follow the Rules of Civil Procedure in an attempt to effect service did not meet acceptable local standards of legal practice.[2]

On July 11, 1975, John Dunn received a decree of divorce, awarding him custody of the children, in Florida. On July 25, 1975, Legal Services effected a proper service on Mr. Dunn, and plaintiff was awarded a decree of divorce and custody of the children on September 12, 1975 in Utah. Plaintiff received a letter in October 1975, wherein, Mr. Dunn offered to return the children if he were assured he wouldn't have to pay child support other than sums he voluntarily chose to give. Later, Mr. Dunn refused to surrender custody of the children.

Mrs. Dunn employed Florida counsel in December, 1975, to set aside the Florida decree; this motion was denied. She has pursued her attempt to have the decree modified; but in Florida as in Utah, she was required to prove a change of circumstances. In March, 1977, her Florida counsel entered into a stipulation, whereby the younger child was returned to plaintiff in return for a promise that she would never seek child support. The older child was to be allowed to visit her mother during the summer.

Defendants made a motion for a directed verdict, which the trial court granted. For the purpose of the motion defendants conceded there was negligence, but argued proximate cause and damages had not been established. Defendants claimed plaintiff, by sending the children to Florida, divested the Utah court of jurisdiction. Also, the Florida court would have found Utah had no jurisdiction to hear the custody matter; and, therefore, if service had been properly effected, plaintiff would have been in no

---

**2.** See 45 A.L.R.2d 5, Anno: Attorney's liability for negligence in preparing or conducting litigation, § 11: "In several cases attorneys have been chargeable with actionable negligence where the client's cause of action was lost, or other damages suffered, because of the attorney's negligent failure to protect the client's claim by complying with notice requirements or by failing to obtain jurisdiction of the opposing parties by proper process."

different circumstances. The damages plaintiff claimed were loss of custody of the children and the legal expenses she incurred in Florida. Plaintiff also sought damages for emotional harm, which defendants argued were not recoverable without a contemporaneous physical impact.

Defendants stressed the children were not present in Utah at the time of the initial hearing of Mrs. Dunn's divorce action on June 24, 1975, and even if there had been a proper service on Mr. Dunn and the decree entered, the consequences would have been the same. Defendants argued Mr. Dunn would have proceeded with his Florida action and been awarded custody of the children, who were present in Florida. To sustain their argument, defendants cited the fact that after Mr. Dunn received his Florida decree, Mrs. Dunn, received a Utah decree of divorce with an award of custody on September 12, 1975.

Prior to the arguments in connection with the motion for a directed verdict, the trial court had ruled it was not an issue in this case as to whether a Utah decree of divorce could have been entered prior to the Florida decree; that the domicile of the children was not relevant. The court further ruled plaintiff could only introduce evidence relating to the alleged negligence of England and McKay up to February 21, 1975, the day England terminated his employment with McKay. Those facts occurring between February 21 and June 19, 1975 (the day Legal Services was engaged) were not admitted into evidence. The trial court also restricted the admission of testimony concerning plaintiff's contacts with the McKay firm, viz., did plaintiff have a contract with the firm to procure her a decree of divorce?

If the service had been made by England in accordance with Rule 4(f)(2), U.R.C.P., what would have been the consequences? England testified he rather than the clerk mailed the summons and complaint on February 5, 1975. Under Rule 4(f)(2) service (if

properly effected) is complete ten days after the clerk's mailing. Under Rule 12(a) defendant has twenty days after service is complete to file his answer, thus Mr. Dunn had thirty days in which to answer after the mailing. Under Rule 55(a), U.R.C.P., the fact of defendant's default could have been entered by the clerk on March 7, 1975, or any time thereafter. (This is assuming proof of service had been made in accordance with Rule 4(g)(3).)

Under the foregoing circumstances, the court would have acquired jurisdiction to enter a decree of divorce and determine custody of the children. The court would not have lost jurisdiction by the children leaving the state on April 20, 1975, nor by their presence in Florida at the time of the initial divorce hearing on June 24, 1975. In *Brown v. Cool*[3] this court stated:

> . . . Once having acquired jurisdiction courts often exercise such jurisdiction in custody cases when the subject is outside of its territorial jurisdiction. . . . [4]

Defendants' entire argument as to proximate cause and damages is predicated on Florida law, specifically that Florida would have ruled the Utah court had no jurisdiction to hear the custody matter in June 1975, because the children were not physically present in Utah on that date. Thus, defendants contend the consequences would have been the same, if Mr. Dunn had been properly served.

Florida law does not support defendants' claim.

In *Mirras v. Mirras*,[5] the issue before the Florida courts was whether a New York court had jurisdiction to award the custody of a minor child, who had been physically outside of New York during the entire proceeding. The court stated:

> . . . In the case before us the divorce proceeding in New York was an initial proceeding instituted without the presence of the child within the jurisdiction of the Court. Therefore, the Court

---

**3.** 123 Utah 505, 509, 260 P.2d 544, 546 (1953).

**4.** See Restatement, 2d, Conflicts, § 26.

**5.** Fla.App., 202 So.2d 887, 892 (1967).

never acquired jurisdiction and could not have continuing jurisdiction for further proceedings.

The court continued by quoting and following the ruling from *Smith v. Davis:* [6]

It has long been the law of this state that courts have no jurisdiction to *initially* adjudicate the custody of a minor child *unless such child is physically present within the territorial jurisdiction of the court at the time suit seeking an adjudication of its custody is filed.* . . .

[Italics supplied by the court in *Mirras.*]

In *Periolat v. Periolat,* [7] the court reiterated the Florida ruling:

However, the court did have jurisdiction to enter the order regarding custody, because the child was within the court's jurisdiction when the complaint was filed and the complaint so alleged. *Mirras v. Mirras,* Fla.App. 2d 1967, 202 So.2d 887; *Rich v. Rich,* Fla.App. 4th 1968, 214 So.2d 777; *Nieburger v. Nieburger,* Fla.App. 1st 1968, 214 So.2d 382. . . .

How do the Florida courts regard a decree awarding custody from a foreign jurisdiction?

In *Mirras v. Mirras,* [8] the court explained that even assuming jurisdiction of the court of a sister state, the Florida courts were not required to recognize the foreign decree affecting custody of a minor child under the full faith and credit clause of the United States Constitution, because that clause was applicable only to final judgments or decrees. A decree awarding custody of a minor was subject to modification as the interest of the minor, might require. The court continued:

. . . And, even though a decree touching custody of minors of the foreign court having jurisdiction is entitled to great weight under the doctrine of comity, that tenet is discretionary with the Court and depends, for its consideration, upon the foreign court having had juris-

diction and having properly litigated the matter before it. [9]

In *Mirras* the court ruled the Florida trial court did not have to give any weight under the doctrine of comity, because of the absence of relevant facts bearing upon the best interest and welfare of the child before the New York court at the time of its decree. Nor was there any evidence with reference to the qualifications of the parent to whom custody was awarded.

In *Powell v. Powell* [10] a Louisiana court entered a final judgment awarding permanent custody of a minor child to the father. Prior to this judgment, the mother brought the child to Florida. After judgment had been rendered in the father's favor, he filed a petition for a writ of habeas corpus in Florida. The court stated:

Although the Louisiana judgment does not require enforcement in Florida under the full faith and credit clause, it is entitled to great weight and respect under the doctrine of comity absent a showing by clear and convincing evidence that new conditions have arisen since rendition of the decree as would justify a change in custody. [Citation] Application of the doctrine of comity is a matter of discretion with the trial judge and depends for its consideration upon the foreign court having had jurisdiction and having properly litigated the matter before it. [Citation]

It is apparent in the present case that the Louisiana court had jurisdiction over the subject matter and the parties and properly litigated the question of custody by receiving evidence on three separate days of hearings. . . .

The court further observed the petition for a writ of habeas corpus had been filed only four days subsequent to the rendition of the Louisiana judgment, and it was obvious there could not have been any appreciable change in the circumstances pertaining

---

6. Fla.App., 147 So.2d 177, 179.

7. Fla.App., 336 So.2d 1256, 1257 (1976).

8. Note 6, supra.

9. At pp. 892–893 of 202 So.2d.

10. Fla.App., 242 So.2d 138, 139 (1970).

to the welfare of the child. The court reversed the order of the trial court with instructions to consider the case in light of the doctrine of comity and other applicable principles set forth in the opinion.[11]

In the matter before us, at the time plaintiff's complaint was filed and constructive service of process was issued, the children were residing with their mother and were present in Utah. If the service of process had been made in accordance with Rule 4(f)(2), U.R.C.P., the court would have acquired jurisdiction to hear the custody issue. Florida law supports such a conclusion.[12] Once the Utah court acquired jurisdiction, the removal of the children to Florida during the mother's illness, would not terminate the power of the court to hear and determine the custody issue. Under Sec. 30-3-4, a decree of divorce can only be granted upon the admission of legal evidence taken in the cause, thus any decree awarding custody of children must be based upon evidence indicating the best interest and welfare of the children and the fitness of the parent to whom custody is awarded.

If England had effected a proper constructive service on Mr. Dunn, Mrs. Dunn could have been awarded a decree of divorce, granting her custody of the minor children on June 24, 1975, a time prior to the award of the Florida decree to Mr. Dunn. Since the Utah court would have had jurisdiction and would have litigated the issue of custody, the Utah decree would have been entitled to great weight under the doctrine of comity in the Florida courts. To attain custody, the burden would have been on Mr. Dunn to prove by clear and convincing evidence that new conditions had arisen since the rendition of the Utah decree, which would justify a change of custody. The negligent manner in which England attempted to effect constructive service on Mr. Dunn was the proximate cause of Mrs. Dunn's loss of custody of the children, or so the jury could have found; the trial court erred in directing the verdict.

The parties are in dispute as to the damages to which plaintiff would be entitled. Mrs. Dunn contends she was entitled to all the fees and expenses she incurred in her attempt to regain custody of the children. She also seeks loss of child support and the cost of transportation which she must pay for the visit of the child residing in Florida. Finally, plaintiff seeks damages for emotional distress and the loss of her relationship with her children.

Mrs. Dunn was entitled to present evidence concerning her fees and legal expenses incurred in Florida, which were a direct consequence of her loss of custody of the children. However, she cannot claim as items of damage loss of child support or the transportation costs of the child living in Florida, because the courts of Utah would not have acquired personal jurisdiction over Mr. Dunn, if he had been served according to the procedure set forth in Rule 4(f)(2), U.R.C.P., which provides for constructive service of a nonresident.

Plaintiff's claim for damages for emotional distress is contingent on the nature of an action for legal malpractice. Generally, legal malpractice constitutes both a tort and a breach of contract.[13]

Legal malpractice consists of the failure of an attorney 'to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the

11. See 35 A.L.R.3d 520, Anno: Extraterritorial Effect of Valid Award of Custody of Child of Divorced Parents, In Absence of Substantial Change of Circumstances, §§ 5, 7(a), pp. 561, 570, and the Florida cases cited therein.

12. *Rich v. Rich,* Fla.App., 214 So.2d 777, 779 (1968), ". . . A suit involving an issue of custody is in the nature of an in rem action where the children are within the jurisdiction of the court. [Citations] For this reason a court within whose territorial jurisdiction the children reside has jurisdiction to adjudicate an issue of custody even though a parent resides in another state. [Citations] For purposes of trying a custody issue under those circumstances service of process under the constructive service statute on the nonresident parent should be sufficient to accord him due process of law. . . ."

13. *Peters v. Simmons,* 87 Wash.2d 400, 552 P.2d 1053 (1976).

tasks which they undertake.' [Citation] When such failure proximately causes damage, it gives rise to an action in tort. Since in the usual case, the attorney undertakes to perform his duties pursuant to a contract with the client, the attorney's failure to exercise the requisite skill and care is also a breach of an express or implied term of that contract. . . .[14]

At the trial plaintiff attempted to prove other violations of duty by England and McKay; this evidence involved proof of facts occurring after England terminated his employment with McKay. Such evidence was excluded by the trial court. If a retrial were granted, this evidence could be admitted as well as evidence of the contract with McKay.

Plaintiff contends she had a contract with McKay to procure her a decree of divorce, in Utah. Employment of one member of a firm is generally deemed to be the employment of the firm.[15] She claims as a violation, the duty of an attorney who undertakes to conduct an action impliedly stipulates he will prosecute it to a conclusion. He cannot abandon the suit without reasonable cause.[16] Although a party may discharge his attorney with or without cause, an attorney may not withdraw from a case except for good cause.[17]

According to plaintiff, McKay has never withdrawn; England withdrew in July, 1975. McKay has cited and relies on *Young v. Bridwell*,[18] wherein this court stated one employing another to perform some work requiring special skill, such as an attorney, though he is by that contract entitled to his personal services and to refuse those of an associate, must be held to have waived the right to his personal assistance where the facts show attendance with an associate, without objection, at a hearing or trial where services contemplated by their employment contract were to be rendered.

The record is factually incomplete as to this asserted waiver. Presently, all that is indicated is that a senior member of the McKay firm gave England plaintiff's files; without consultation as to her preference, plaintiff was referred to England when she contacted the McKay firm; England refused to continue the case without payment of an additional sum of money. In a determination of the facts as to who, in fact, sustained the attorney relationship with client, plaintiff, it is appropriate to observe that the primary obligation of lawyers associated in practice is not to mislead the clients as to who is responsible to the client.[19]

In connection with England's duty not to withdraw without good cause and his duty to prosecute the divorce action to completion, if the facts indicate plaintiff was his client, an analysis of his demand for additional money must be made. According to the evidence, the original contract of employment was a $75 retainer with the payment of additional sums as plaintiff was able. Thereafter, England refused to proceed without an additional payment, although he knew of plaintiff's precarious finances and the children's travel to Florida. England subsequently withdrew from the case, was there good cause?

Contracts which are either made or modified after the relationship has been established labor under the presumptive onus of unfairness and invalidity and the burden is upon the attorney to prove that they were entered into openly and equitably. The law here requires of the attorney conduct which is much more unselfish and 'stricter than the morals of the market place'. In a leading case, the court

**14.** *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 98 Cal.Rptr. 837, 838–839, 491 P.2d 421, 422–423 (1971).

**15.** 7 Am.Jur.2d, Attorneys At Law, § 91.

**16.** *Riley v. District Court In and For The Second Judicial District*, Colo., 507 P.2d 464 (1973).

**17.** *Midvale Motors, Inc. v. Saunders*, 21 Utah 2d 181, 442 P.2d 938 (1968); *Matter of Kaufman*, Nev., 567 P.2d 957 (1977); *Hansen v. Wightman*, 14 Wash.App. 78, 538 P.2d 1238, 1250–1251 (1975).

**18.** 20 Utah 2d 332, 336, 437 P.2d 686 (1968).

**19.** *Koehler v. Wales*, 16 Wash.App. 304, 556 P.2d 233 (1976).

described the practice of law as a profession, 'not a trade but a ministry' . . .[20]

Plaintiff was entitled to claim damages for mental anguish. As previously observed, an action for legal malpractice may be framed conceptually as either a tort or a breach of contract. This is not a case where no actionable wrong existed except for mental pain and suffering. In this jurisdiction, mental pain and suffering in connection with a wrong, which apart from such pain and suffering constitutes a cause of action, is a proper element of damages where it is a natural and proximate consequence of the wrong.[21]

In *McEvoy v. Helikson*,[22] a malpractice action against an attorney, defendant urged that damages for mental anguish sought by plaintiff were improper. The court stated that "where the wrongful act constitutes an infringement of a legal right, mental suffering may be recovered for, if it is the direct, proximate and natural result of the wrongful act." The court ruled, if the evidence established defendant's conduct resulted in the infringement of plaintiff's right to custody of his child, plaintiff would be entitled to recover damages for anguish and mental suffering, owing to the loss of his minor child.[23]

WILKINS, J., concurs in the views expressed in the dissenting opinion of MAUGHAN, J.

---

**20.** 10 Williston On Contracts (3rd Ed. Jaeger), § 1285, p. 919; also see *Skeen v. Peterson*, 113 Utah 483, 196 P.2d 708 (1948).

**21.** *Lambert v. Sine*, 123 Utah 145, 150, 256 P.2d 241 (1953).

**22.** 277 Or. 781, 562 P.2d 540, 544 (1977).

**23.** Also see *Talbot v. Schroeder*, 13 Ariz.App. 230, 475 P.2d 520 (1971), a malpractice action; *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 489, 510 P.2d 1032, 1041 (1973), wherein the court upheld a recovery for mental suffering where the action sounded in both tort and contract.