Jo–Ann W. KILPATRICK; George L. Gonzales; Joseph C. Lee; David B. Lee; Marilyn D. Lee; Sidney W. Foulger; Clayton F. Foulger; Bryant F. Foulger; Brent K. Pratt; and MWT Corporation, a Utah corporation, Plaintiffs and Appellants,

v.

WILEY, REIN & FIELDING, a professional law partnership; and Richard E. Wiley, Defendants and Appellees.

No. 940579–CA.

Court of Appeals of Utah.

Jan. 5, 1996.

1284

Gordon R. Hall, Harold G. Christensen, Reed L. Martineau, Rex E. Madsen, and Richard A. Van Wagoner, Salt Lake City, for Appellants.

Daniel L. Berman, Peggy Tomsic, and Jonathan Hawkins, Salt Lake City, for Appellees.

Before GREENWOOD, JACKSON and WILKINS, JJ.

## OPINION

JACKSON, Judge:

Jo–Ann W. Kilpatrick, et al. (plaintiffs) appeal the trial court's grant of summary judgment in favor of Wiley, Rein & Fielding (defendant) and Richard E. Wiley in this legal malpractice action sounding in breach of fiduciary duty. Specifically, plaintiffs argue the trial court applied the wrong standard of causation for legal malpractice claims based on breach of fiduciary duty. Plaintiffs also argue the trial court incorrectly determined that issues of material fact surrounding causation were undisputed. We reverse and remand.

## BACKGROUND

This labyrinthine dispute between lawyers and their clients arises from apparent conflicts of interest within a Washington, D.C. law firm. When reviewing summary judgment, we recite the facts in a light most favorable to the nonmoving party. *See Harmon City, Inc. v. Nielsen & Senior,* 907 P.2d 1162, 1164 (Utah 1995); *Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993).

In the early 1980s, the Federal Communications Commission (FCC) approved a new VHF television station for the Salt Lake City market (Channel 13). Plaintiffs hired defendant, a law firm specializing in communications law, to represent them in their effort to obtain the newly offered license. Upon defendant's advice, plaintiffs formed Mountain West Television Company (MWTC), a Utah general partnership, to apply for the license. From 1981 until 1987, defendant represented MWTC not only in its bid for the Channel 13 license but also in all matters of partnership business.

In 1985, the FCC conducted a comparative hearing of applications for the Channel 13 license. The FCC ranked MWTC second of the five applicants. Upon defendant's advice, MWTC appealed the FCC's decision. The FCC Review Board affirmed the original ranking of applicants for the Channel 13 license. Rather than pursue its appeal further, MWTC decided, again upon defendant's advice, to buy out its four competing applicants. MWTC further decided to seek a financing partner to pay for settlements with the competing applicants and to provide additional financing for the Channel 13 venture.

Also during 1985, Adams Communications (Adams) became defendant's client. Adams owned KSTU, Channel 20, a UHF television station in Salt Lake City. Plaintiffs objected to defendant's representation of Adams. Defendant responded that the firm's representation of Adams did not present an immediate conflict of interest and that, if MWTC and Adams ever had conflicting interests, the firm would not represent either party. Nonetheless, in January 1986, the firm represented Adams in the possible purchase of Channel 13 and sale of Channel 20. Defendant did not disclose that specific representation of Adams to plaintiffs.

Early in 1986, the defendant law firm acquired another client interested in the Salt Lake City communications market—Northstar Communications (Northstar). Northstar was principally owned by Allstate Insurance Company (Allstate) and was formed to invest in broadcast communications properties. Northstar became defendant's client upon Northstar's inception. Richard E. Wiley, the senior partner of the defendant law firm, sat on Northstar's board of directors. Shortly after its formation, Northstar ex-

pressed an interest in the acquisition of Channel 13. Defendant recognized a conflict of interest in representing Northstar in its efforts to acquire Channel 13 because of its long-time representation of MWTC. However, defendant thought it appropriate to introduce Northstar directors to the MWTC partners. During the spring of 1986, defendant continued to represent MWTC, including representation at several conversations concerning Northstar's potential buy-out of MWTC's competing applicants for the Channel 13 license and investment in the television station.

In June 1986, senior partners of the defendant law firm announced defendant would represent Northstar in the Channel 13 matter and the negotiation of its agreement with MWTC. Defendant was concerned that if Northstar were required to secure separate counsel in this particular matter, Northstar might take all its business to another law firm. Although MWTC was a long-time client, Northstar was the more lucrative client. The law partner principally responsible for MWTC's representation objected to the firm representing anyone entering into a deal with MWTC. MWTC's principal attorney maintained defendant could not ethically represent Northstar in the Channel 13 matter because of the firm's long-time representation of MWTC. Senior partners in the defendant law firm directed MWTC's principal attorney to obtain MWTC's consent for the firm's representation of Northstar.

MWTC's principal attorney telephoned some of the MWTC partners to request their consent to the defendant law firm's representation of Northstar. At least one of the MWTC partners refused to consent, and two of the MWTC partners were never contacted. Defendant did not seek or ever obtain written consent from MWTC for its representation of Northstar. Defendant never disclosed to MWTC the nature and extent of its representation of Northstar. Defendant did not fully explain to MWTC the implications, the risks, or the effects of its representation of Northstar. Although MWTC became aware of a connection between defendant and Northstar, MWTC was not aware of the extent or consequences of the defendant law firm's conflict of interest. MWTC ultimately believed defendant would represent its interests exclusively and loyally as defendant had done during the previous five years, including MWTC's early negotiations with Northstar.

After failing to obtain consent from MWTC to represent Northstar in the Channel 13 matter, defendant continued to represent MWTC. Defendant apparently represented Northstar simultaneously in the same matter. As counsel to MWTC, defendant worked to negotiate financing for the buy-out of MWTC's competing applicants, to obtain the Channel 13 license, and to put the station in operation. Communications Partners Limited (CPL), one of the potential investors in Channel 13, presented MWTC a financing proposal. CPL committed ten million dollars to MWTC in exchange for sixty percent interest in its Channel 13 venture. Northstar made a very similar financing proposal to MWTC: the basic exchange was ten million dollars for sixty percent interest in the station. Defendant reviewed the financing proposals from CPL and Northstar and then advised MWTC to accept Northstar's offer.

After accepting Northstar's ten-million-dollar commitment and rejecting CPL's commitment on behalf of MWTC, defendant negotiated agreements to buy out MWTC's competing applicants for Channel 13. These agreements, drafted by defendant, called for MWTC to buy out its competing applicants for five million dollars and personally obligated the MWTC partners to pay three of the five million dollars, regardless of whether Northstar's ten-million-dollar commitment was ever realized.

Sometime during the summer of 1986, some of the MWTC partners contacted Ralph Hardy, a communications attorney with the law firm of Dow, Lohnes & Albertson, seeking advice concerning financial issues relating to Channel 13. Hardy's law firm billed MWTC for legal services beginning July 15, 1986. Hardy's initial efforts apparently were on behalf of only some of the MWTC partners and were limited to financial advice regarding the financing proposals from potential Channel 13 investors. Through the summer and fall of 1986,

MWTC continued to rely on defendant as its legal counsel in the Channel 13 matter. Although the MWTC partners understood Hardy was a financial consultant, they did not consider Hardy to be MWTC's attorney.

In November of 1986, after defendant had prepared agreements for the buy-out of MWTC's competing applicants, defendant simultaneously represented both Northstar and MWTC in preparing an agreement for the Channel 13 venture between Northstar and MWTC. Northstar and MWTC formed a Utah limited partnership known as Mountain West Television Limited (MWT Ltd.). However, several terms of the MWT Ltd. agreement were contrary to the deal to which MWTC previously had agreed. For example, Northstar reduced its original ten-million-dollar commitment to seven million dollars. Additionally, MWT Corporation, a Utah corporation composed of the MWTC partners, would serve as general partner of MWT Ltd. for a short time. Northstar eventually would become general partner with complete control of the station's management, and MWT Corporation would become only a limited partner.

Once the new and unexpected terms of the MWT Ltd. agreement became known to MWTC, MWTC had protracted discussions with Northstar across three days. These meetings were held at defendant's Washington, D.C. office. Three of the four MWTC partners remained in Salt Lake City. Although Hardy acted as an advisor for the MWTC partner who was present at the meetings, MWTC continued to look to defendant as its attorney. It was at these meetings that MWTC first learned defendant was simultaneously representing Northstar in the same matter. MWTC acquiesced to the new and unexpected terms of the MWT Ltd. agreement in part because MWTC was liable to the competing Channel 13 applicants for a two-million-dollar payment due on the following Monday.

Following execution of the MWT Ltd. agreement, defendant continued to represent plaintiffs. Defendant prepared and filed a petition with the FCC to substitute MWT Ltd. for MWTC as the Channel 13 applicant. Defendant also continued to represent Northstar in matters involving the MWTC partners and Channel 13 business. Defendant also advised Northstar regarding MWT Ltd.'s possible purchase of Channel 20. MWT Ltd. would purchase Channel 20 from Adams, another of defendant's clients, for approximately thirty million dollars rather than allow Channel 20 to compete with Channel 13. Plaintiffs objected to the purchase, but when Northstar threatened to withdraw the funds it previously had agreed to provide, plaintiffs acceded once again to Northstar's demands.

During the fall of 1987, plaintiffs' principal attorney left the defendant law firm. That fall, defendant represented Northstar in connection with the substitution of Northstar for MWT Corporation as the general partner of MWT Ltd. At approximately the same time, a new corporation, Farragut, was formed to own all of Northstar's stock. Allstate was Farragut's primary shareholder. By this time, plaintiffs had retained Hardy as their attorney; however, his efforts at maintaining any control of Channel 13 for the plaintiffs were unsuccessful.

In 1989, MWT Ltd. needed additional funds to meet its debt obligations resulting from the Channel 20 purchase. Defendant simultaneously represented Farragut, Northstar, and MWT Ltd., even though MWT Ltd. had interests adverse to Northstar and Farragut. At the same time, Allstate was also a client of the defendant law firm. Defendant prepared promissory notes from MWT Ltd. in favor of Allstate at twenty-five percent interest. Allstate also insisted as a condition of providing loans to MWT Ltd. for the station's short-term debt that MWT Ltd. sign a management contract that further obligated MWT Ltd. to pay Farragut $17,500 per month. Hardy represented plaintiffs in another unsuccessful attempt to resist these actions.

Defendant also represented MWT Ltd. in its decision to sell Channel 13 to Fox in 1989. Plaintiffs strongly opposed the sale but were unsuccessful in negotiations yet again. Plaintiffs received no proceeds from the sale of Channel 13 to Fox. Moreover, almost a year and a half after the sale, Northstar sent plaintiffs a "cash call" that supposedly obli-

gated them to pay over two million dollars for the unpaid debts of MWT Ltd. Northstar based the "cash call" on a provision in the MWT Ltd. partnership agreement drafted by defendant.

In February 1990, plaintiffs filed the instant legal malpractice action against defendant and Mr. Wiley, claiming breach of fiduciary duty. Plaintiffs alleged that had Northstar honored its original commitment for ten million dollars and had Channel 13 gone into direct competition with Channel 20 rather than buying out Channel 20, plaintiffs' interest in Channel 13 would have been worth approximately twenty million dollars. Accordingly, plaintiffs sought damages in that amount.

Following extensive discovery,[1] defendant moved for summary judgment. Defendant conceded material fact issues existed as to whether it had breached its fiduciary duties of loyalty and confidentiality and on whether plaintiffs sustained twenty million dollars in damages. Nonetheless, defendant argued plaintiffs could not make out the essential element of causation in their legal malpractice claim. The trial court granted summary judgment, concluding that no material fact issues existed on the element of causation and that plaintiffs had failed to show defendant's breach of fiduciary duty proximately caused any damage to plaintiffs. Plaintiffs appealed.

## ISSUES

Plaintiffs' appeal presents two issues for our review: (1) whether the trial court applied the proper standard of causation for legal malpractice actions; and (2) whether the trial court correctly determined that issues of material fact concerning causation were undisputed.

## STANDARD OF REVIEW

■ It is well settled that Utah appellate courts affirm grants of summary judgment only when no genuine issues of material fact exist and when the moving party is entitled to "judgment as a matter of law." Utah R.Civ.P. 56(c); *Republic Group, Inc. v.*

*Won–Door Corp.*, 883 P.2d 285, 288 (Utah App.1994). "We do not defer to the trial court's conclusion that facts are undisputed nor its legal conclusions supported by those facts." *Oquirrh Assocs. v. First Nat'l Leasing Co.*, 888 P.2d 659, 662 (Utah App.1994).

■ We therefore review the trial court's grant of summary judgment for correctness. *Transamerica Cash Reserve, Inc. v. Dixie Power & Water, Inc.*, 789 P.2d 24, 25 (Utah 1990). Furthermore, we "view the facts, including all inferences arising from those facts, in a light most favorable to the party opposing the motion and will allow the summary judgment to stand only if the movant is entitled to judgment as a matter of law on the undisputed facts." *Republic Group*, 883 P.2d at 288–89.

## ANALYSIS

### I. Standard of Causation for Legal Malpractice

■ Legal malpractice is a generic term for at least three distinct causes of action available to clients who suffer damages because of their lawyers' misbehavior. Clients wronged by their lawyers may sue for damages based on breach of contract, breach of fiduciary duty, or negligence. *See* Roy R. Anderson & Walter W. Steele, Jr., *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle*, 47 SMU L.Rev. 235 (1994) (arguing for careful distinctions between contract, tort, and fiduciary duty causes of action for legal malpractice); *see also Dunn v. McKay, Burton, McMurray & Thurman*, 584 P.2d 894, 904 (Utah 1978) (Maughan, J., dissenting) (stating "an action for legal malpractice may be framed conceptually as either a tort or a breach of contract"). Regardless of whether the cause of action is based on negligence, breach of contract, or breach of fiduciary duty, the central purpose of the law of legal malpractice is to guard against and to remedy exploitation of the power lawyers possess over their clients' lives and property. *See* Anderson & Steele, *supra*, at 236.

---

1. The parties have amassed a record on appeal of nearly 13,000 pages.

While legal malpractice actions based on breach of contract are conceptually distinct, legal malpractice actions based on negligence and breach of fiduciary duty are more difficult to differentiate. As fiduciaries, attorneys have a legal duty "to represent the client with undivided loyalty, to preserve the client's confidences, and to disclose any material matters bearing upon the representation [of the client]." 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 11.1, at 631 (3d ed. 1989). Accordingly, an attorney's fiduciary duty is two-fold: undivided loyalty and confidentiality. 1 *id.*

An attorney's failure to provide undivided loyalty to a client does not necessarily mean that an attorney has performed legal services negligently. Instead, an attorney's failure to provide undivided loyalty to a client means that an attorney has performed legal services outside the scope of the authority granted by the client. Anderson & Steele, *supra*, at 236 n. 4. Legal malpractice based on negligence concerns violations of a standard of care; whereas, legal malpractice based on breach of fiduciary duty concerns violations of a standard of conduct. *See id.* at 249.

Breach of fiduciary duty, therefore, provides a basis for legal malpractice separate and apart from professional negligence. Moreover, it is axiomatic that legal malpractice sanctions are distinct from professional disciplinary sanctions. "Courts throughout the United States have not hesitated to impose civil sanctions upon attorneys who breach their fiduciary duties to their clients, which sanctions have been imposed separately and apart from professional discipline." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1286 (1992).

In Utah, the law of legal malpractice has grown chiefly around actions based on negligence. *See, e.g., Harmon City, Inc. v. Nielsen & Senior*, 907 P.2d 1162, 1167–68 (Utah 1995); *Williams v. Barber*, 765 P.2d 887, 888–89 (Utah 1988) (plurality opinion); *Dunn*, 584 P.2d at 895; *Harline v. Barker*, 854 P.2d 595, 598 (Utah App.), *cert. denied*, 862 P.2d 1356 (Utah 1993); *Swift Stop, Inc.*

*v. Wight*, 845 P.2d 250, 252–53 (Utah App. 1992). Nevertheless, Utah law has long recognized the fiduciary nature of the attorney-client relationship and made clear that attorneys will be held accountable for breaches of their fiduciary duties to clients. *See e.g., Smoot v. Lund*, 13 Utah 2d 168, 172, 369 P.2d 933, 936 (1962).

In all relationships with clients, attorneys are required to exercise impeccable honesty, fair dealing, and fidelity. The Utah Supreme Court has articulated the standard to which attorneys must be held as follows:

> Where an attorney is hired solely to represent the interest of a client, his fiduciary duty is of the highest order and he must not represent interests adverse to those of the client. It is also true that because of his professional responsibility and the confidence and trust which his client may legitimately repose in him, he must adhere to a high standard of honesty, integrity[,] and good faith in dealing with his client. He is not permitted to take advantage of his position or superior knowledge to impose upon the client; nor to conceal facts or law, nor in any way deceive him without being held responsible therefor.

*Id.* Utah law therefore recognizes legal malpractice actions based on breach of fiduciary duty. Such actions are grounded on the fundamental principle that attorneys must be completely loyal to their clients and must never use their position of trust to take advantage of client confidences for themselves or for other parties. *See Margulies ex rel. Margulies v. Upchurch*, 696 P.2d 1195, 1204 (Utah 1985).

The present case focuses our attention on the standard of causation for legal malpractice actions. The essential elements of legal malpractice based on breach of fiduciary duty include the following: (1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty to the client; (3) causation, both actual and proximate; and (4) damages suffered by the client. *Cf. Harline*, 854 P.2d at 598 (enumerating elements of legal malpractice based on negligence). For purposes of summary judgment, defendant conceded that an attorney-client relationship existed and that genuine issues of

material fact existed on the questions of breach and damages. However, defendant prevailed on summary judgment because the trial court ruled plaintiffs had not shown any disputed material facts existed on the element of causation. In other words, in the trial court's view, plaintiffs failed to make the essential connection between the concept of fault and the reality of damages.

■ The standard of causation for legal malpractice, like legal malpractice law generally, has grown in the context of actions based on negligence. We must now determine whether the same standard of causation applies to legal malpractice actions based on breach of fiduciary duty. A vital rule of legal malpractice actions is that the alleged wrong of the attorney must proximately cause the client's injury. *See, e.g., Dunn*, 584 P.2d at 896. Although breach of fiduciary duty actions concern different wrongs from negligence actions, the same standard of causation applies whether the alleged wrong is a negligent act, a fiduciary breach, or even a contractual breach. 1 Mallen & Smith, *supra* § 8.3, at 413; *see also* Anderson & Steele, *supra*, at 253 (observing "client retains ordinary burdens of pleading and proof regarding causation"). Therefore, the standard of causation for a legal malpractice action based on breach of fiduciary duty is the same as that for a legal malpractice action based on negligence.

■ In Utah, causation or the connection between fault and damages in legal malpractice actions "cannot properly be based on speculation or conjecture." *Dunn*, 584 P.2d

at 896. To prevail in legal malpractice actions, clients must establish actual cause—that but for the attorney's wrong their loss would not have occurred—and proximate cause—that a reasonable likelihood exists that they would have ultimately benefited. *See Williams*, 765 P.2d at 889–90 (plurality opinion); *Dunn*, 584 P.2d at 896–97; *Young v. Bridwell*, 20 Utah 2d 332, 337, 437 P.2d 686, 689 (1968).[2]

■ We previously have distilled the standard for causation in legal malpractice actions to the following: "The client must show that if the attorney had adhered to the ordinary standards of professional *competence and had done the act he failed to do or not done the act complained about*, the client would have benefited." *Harline*, 854 P.2d at 600 (emphasis added). Of course, that statement grows from a legal malpractice claim based on negligence. *See id.* at 598. Although the burden of establishing causation is the same regardless of whether the cause of action is based on negligence or breach of fiduciary duty, we offer the following statement in summary and for the sake of clarity: In legal malpractice actions based on breach of fiduciary duty, clients must show that if the attorney had adhered to the ordinary standards of professional *conduct and had not breached fiduciary duties*, the client would have benefited.[3]

Insofar as the trial court applied a standard of causation that required plaintiffs to establish that but for defendant's breach of fiduciary duty a reasonable likelihood existed that defendant would have benefited, the tri-

---

**2.** Because plaintiffs' claim sounds in breach of fiduciary duty rather than negligence, they argue the standard of causation should be less strict. Relying on *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 542 (2d Cir.1994), plaintiffs suggest they need only establish that the course of action they took resulted in loss and that defendant's breach was "a substantial factor" in leading plaintiffs to take that course of action. *Id.* at 543. Although plaintiffs maintain the substantial factor standard is somehow less strict than the established standard of causation in Utah, they have not shown how it is conceptually any different. For this reason and because our research shows that generally the same rules of causation apply whether the cause of action sounds in contract, negligence, or breach of fiduciary duty, *see* 1 Mallen & Smith, *supra* § 8.3, at

413, we decline to adopt a new standard of causation for legal malpractice actions based on breach of fiduciary duty.

**3.** In describing legal malpractice based on breach of fiduciary duty as nonadherence to ordinary standards of professional conduct, we do not mean that violations of the Rules of Professional Conduct give rise to a cause of action for legal malpractice. The Rules of Professional Conduct are not a basis for civil liability. *See* Utah Code Jud.Admin. Ch. 13, Rules of Professional Conduct, Scope. Breach of an attorney's fiduciary duty may well violate the Rules of Professional Conduct; however, professional discipline does not equate to civil liability for legal malpractice.

al court was correct. However, we must also review whether the trial court correctly determined that issues of material fact surrounding causation were undisputed.

## II. Disputed Issues of Material Fact Surrounding Causation

▆ Generally, causation "cannot be resolved as a matter of law." *Butterfield v. Okubo,* 831 P.2d 97, 106 (Utah 1992). "Proximate cause is an issue of fact. Thus, only if there is no evidence upon which a reasonable jury could infer causation, is summary judgment appropriate." *Harline v. Barker,* 854 P.2d 595, 600 (Utah App.) (citations omitted), *cert. denied,* 862 P.2d 1356 (Utah 1993). In other words, Utah litigants do not easily dispose of the element of causation on summary judgment.

▆ Causation is a highly fact-sensitive element of any cause of action. In Utah, "[p]roximate causation is '[t]hat cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the result would not have occurred.'" *Butterfield,* 831 P.2d at 106 (citations omitted). To establish causation, plaintiffs must persuade a fact finder that their injury was a natural result of the defendant's breach. Plaintiffs therefore must spin together myriad facts into a durable thread that reasonably connects defendant's breach to plaintiffs' injury. Utah courts have recognized that "[f]act-sensitive cases ... do not lend themselves to a determination on summary judgment." *Draper City v. Estate of Bernardo,* 888 P.2d 1097, 1101 (Utah 1995).

▆ The Utah Supreme Court recently pointed out that "[o]n a motion for summary judgment, a trial court should not weigh disputed evidence and its sole inquiry should be whether material issues of fact exist." *Id.* at 1100. The court also observed that

> "[i]t is not the purpose of the summary judgment procedure to judge the credibility of the averments of parties, or witnesses, or the weight of evidence. Neither is it to deny parties the right to a trial to resolve disputed issues of fact. Its pur-

pose is to eliminate the time, trouble[,] and expense of trial when upon any view taken of the facts as asserted by the party ruled against, he would not be entitled to prevail."

*Id.* at 1101 (quoting *Holbrook Co. v. Adams,* 542 P.2d 191, 193 (Utah 1975)). Moreover, "'it only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact.'" *Id.* (quoting *Holbrook,* 542 P.2d at 193) (emphasis added).

In the present case, the trial court found facts and weighed evidence presented by the parties, which was inappropriate in considering a motion for summary judgment. *See id.* at 1100. The trial court's only inquiry should have been whether genuine issues of material fact existed. Although the trial court explicitly recognized disputed facts in its oral ruling, it nonetheless pressed forward, judging the credibility of and weighing the evidence. In doing so, the trial court failed to observe that "doubts about whether a nonmovant has established a genuine issue of material fact should be resolved in favor of permitting the party to go to trial." *Butterfield,* 831 P.2d at 107.

▆ The plaintiffs presented evidence suggesting that had defendant not breached its duty of loyalty, they would have accepted CPL's financing commitment rather than Northstar's financing commitment and would have benefited from that choice. Plaintiffs' evidence also suggested that had defendant not breached its duty of loyalty, Channel 13 likely would have gone into direct competition with, rather than purchased, Channel 20, and plaintiffs would have benefited from that choice. Therefore, plaintiffs created issues of fact on the element of causation. Although at this stage of the litigation plaintiffs' causation theory may appear somewhat strained, "it is the province of the jury ... to determine whether the causation theory is fatally attenuated." *Id.* at 106; *accord Swift Stop, Inc. v. Wight,* 845 P.2d 250, 253 (Utah App.1992).

▆ The trial court also improperly weighed evidence and found that plaintiffs had independent legal representation. The

factual question of whether plaintiffs were represented by independent counsel translates into the legal theory that a sufficient intervening cause broke the thread of causation between defendant's breach and plaintiffs' damages. An intervening cause is an independent event, not reasonably foreseeable, that completely breaks the connection between fault and damages. *See Steffensen v. Smith's Management Corp.*, 820 P.2d 482, 487–88 (Utah App.1991), *aff'd*, 862 P.2d 1342 (Utah 1993). Utah courts have always recognized the fact-intensive nature of intervening cause inquiries. *See, e.g., Harris v. Utah Transit Auth.*, 671 P.2d 217, 220 (Utah 1983); *Jensen v. Mountain States Tel. & Tel. Co.*, 611 P.2d 363, 365 (Utah 1980); *Steffensen*, 820 P.2d at 488–89.

Plaintiffs presented evidence suggesting that they acquired independent legal representation much too late even to mitigate let alone avoid their damages resulting from defendant's breach. Plaintiffs presented evidence suggesting that only some of them acquired independent legal representation. Plaintiffs' evidence also suggested that their independent representation was not legal representation but was merely financial advice. In other words, the time, scope, and nature of plaintiffs' independent representation remains disputed. Thus, plaintiffs created genuine issues of fact on whether a sufficient intervening cause broke the thread of causation between defendant's breach of fiduciary duty and plaintiffs' damages. A jury must sort out such factual disputes and decide whether plaintiffs' thread of causation remains taut and unbroken. *See Butterfield*, 831 P.2d at 106.

In sum, "[b]ecause proximate cause is an issue of fact, we refuse to take it from the jury if there is *any evidence* upon which a reasonable jury could *infer* causation." *Butterfield*, 831 P.2d at 106 (emphasis added); *see also Harline*, 854 P.2d at 602–03 (Utah App.1993) (reversing summary judgment in legal malpractice case based on disputed issues of material fact surrounding causation); *Swift Stop*, 845 P.2d at 253 (same). The trial court improperly weighed evidence to reach its determination that material issues of fact surrounding causation were undisputed. The plaintiffs presented evidence that created genuine issues of material fact; therefore, the trial court inappropriately granted summary judgment.

## CONCLUSION

We hold the standard of causation for legal malpractice is the same regardless of whether the cause of action is based on breach of contract, breach of fiduciary duty, or negligence. Plaintiffs must show that but for their attorney's wrong a reasonable likelihood exists that they would have benefited. We conclude that because plaintiffs in the present case created genuine issues of fact surrounding the element of causation, the trial court improperly granted summary judgment in favor of defendant. Accordingly, we reverse the trial court's order of summary judgment and remand the matter for further proceedings consistent with this opinion.

GREENWOOD and WILKINS, JJ., concur.